# Exhibit A



STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

Tyee Burke, Individually, and
MARC BURKE, JR., by his
Next Friend and mother, Tyee Burke,

   Plaintiffs,

vs.

BURKE, TYEE , et al. v ST JOHN HE
Hon. Wendy M. Baxter  05/02/2011

11-005193-NH

St. John Health, a Michigan corporation,
St. John Health d/b/a Providence Hospital and Medical Center, a Michigan corporation,
Providence Hospital, a Michigan corporation,
Dr. Sabrina Hanna,
Dr. Glenn Taylor,
Dr. Soheyla Pezeshki, and
Dr. Gary Mennie, Jointly and Severally,

   Defendants.

_____/

ARDIANA CULAJ (P71553)
THE THURSWELL LAW FIRM, P.L.L.C.
Attorneys for Plaintiffs
1000 Town Center
Suite 500
Southfield, Michigan 48075-1221
(248) 354-2222
_____/

*THE THURSWELL LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222*

**There is another pending or resolved civil action, which arises out of the same transaction or occurrence, alleged in the Complaint, _Civil Action Number 10-006-659 NH, Tyee Burke vs. St. John Health, et al., before Judge Wendy M. Baxter._**

### COMPLAINT, DEMAND FOR JURY TRIAL AND AFFIDAVIT OF MERITORIOUS CLAIM

  NOW COME the above-named Plaintiffs, by their attorney Ardiana Culaj of THE

THURSWELL LAW FIRM, P.L.L.C., and complaining against the above-named Defendants

-1-

each of them, their agents, servants and/or employees, either real or ostensible and say as follows:

1. That **Plaintiffs** are residents of South Carolina.

2. That **Defendant, St. John Health**, is a Michigan corporation, authorized to do business in the State of Michigan, with principal offices in Wayne County, Michigan.

3. That **Defendant, St. John Health does** business as **Providence Hospital and Medical Centers, Inc.,** a Michigan corporation, authorized to do business in the State of Michigan.

4. That **Defendant, Providence Hospital and Medical Centers, Inc**. (hereinafter referred to as Defendant hospital) is a Michigan corporation, authorized to do business in the State of Michigan.

5. That Tyee Burke received prenatal care from the **Deighton Family Practice Clinic** the assumed name of Defendant, St. John Health and/or Providence Hospital and Medical Center, Inc. on **9/10/02**, **10/1/02**, **10/15/02**, **11/5/02**, **11/14/02**, **11/19/02** gestational age 39, fundal height 36, return to clinic in 1 week." P12

6. That the records of **Deighton Family Practice Clinic** on the **mother, Tyee Burke**, indicate, "**11/19/02** backache, patient having some contractions, patient will see Dr. ___ next week, then see Dr. Raook after that." P21

7. That the records of **Deighton Family Practice Clinic** on the **mother, Tyee Burke**, indicate, "**11/14/02** we depend on gestational age on ultrasound which was done late so it was not accurate so see her in 1 week for follow up." P23

8. That the records of **Deighton Family Practice Clinic** on the **mother, Tyee Burke**, indicate, "**10/1/02** after reviewing… ultrasound they said we can follow up with the patient, isn't high risk, it's mostly wrong date… so I'm seeing her in 2 weeks." P25

9. That the records of **Deighton Family Practice Clinic** on the **mother, Tyee Burke**, indicate, "**9/4/02** The patient is a 29-year-old female coming in for evaluation of her pregnancy. Patient states that her last menstrual period she thinks was around **04/29/2002**. This is her fourth pregnancy." P30

10. That the records of **Women's Health Clinic** on the **mother, Tyee Burke**, indicate, "**9/26/02** ultrasound report: **Conclusions**:  Single live intrauterine fetus corresponding in size by current ultrasound to 31 weeks and 2 days." P3-4

11. That the records of **Women's Health Clinic** on the **mother, Tyee Burke**, indicate (Order from the Defendant hospital record contained in these Women's Health Clinic records) "**11/23/02** Attending should be OB staff, not Dr. G. Taylor." P48

12. That the records of **Women's Health Clinic** on the **mother, Tyee Burke**, indicate, "Cord gases: 6.44 (or 6.99) / 59.4 / 38/4 / 14.2 / -18. Arterial sample clotted."  P65

## Triage

13. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 OB Evaluation Triage Record: Chief Complaint:** Contractions every 5-6 minutes, + bloody show. P 55

14. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**Obstetric History & Physical / EDC: 11/26/02**. Contractions every 5-6 minutes. **IUP at 39-4/7 weeks. Presents to Labor and Delivery triage with complaint of regular uterine contractions past few hours. + bloody show, + fetal movement per mom.**  P 5

15. That the records of Defendant hospital on the mother, Tyee Burke, indicate on **11/23/02** at approximately **0055** an electronic fetal monitor was attached to Tyee Burke at Defendant Providence Hospital. P55

16. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0055**. EFM 150's decreased variability, mode toco. Nurse Abernathy. P 55

17. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0100**. Dilatation 1-2 / effacement 50% / station –3 / vertex. **Initials SAH (Dr. Sabrina Hanna)**.  P 55

18. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0110** mode **EFM 140's + variability, decelerations** 120-110, toco. Nurse Abernathy. P 55

19. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0110** IV started, **FHT 150 ↓ 120, Dr. Hanna aware**, patient to left lateral position. SVE as above. FHT 150's. Nurse Abernathy.  P 55

20. That the fetal monitoring graph with computer notes thereon for **11/23/02** indicates, "Dr. Hanna at bedside at **0113**. Abernathy, RN."  (P2 FMG)

21. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0130** mode EFM FHT 140-150, + variability **? ↓ 90**. Graphing intermittent, toco. Nurse Abernathy.  P 55

22. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0140 FHT 150 ↓ 60** with contractions, patient to RLP. **Dr. Hanna aware. Signed: J.A.**

THE ROSSWELL LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222



Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

(Nurse Janine Abernathy).  **Outpatient transferred to LDR#2** via cart with belongings. **Report to L. Levy, RN.** P 55

23. That the fetal monitoring graph with computer notes thereon for **11/23/02** at **0140** indicates, "O₂ mask."  (P6 FMG)

24. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0200** Contractions every 5-6 minutes, **FHT 130-140, moderate variability, with deep variables to 70-120 BPM with good return to baseline. Vaginal Exam: 1-2 / 70% / -2 / -3.  Assessment**: IUP at 39-4/7 weeks with deep **variables 70-120 BPM with good return to baseline. Admit to Labor and Delivery, oxygen facemask, lateral position, Pitocin per protocol. D/W Dr. Glenn Taylor.** Signed: Dr. Hanna **11/23/02 0200** Signed: _____ 1/16/03.  P 6

25. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0200 mild variables down to 70-120, admit to Labor and Delivery, start Pitocin per protocol. D/W Dr. Glenn Taylor.** P7

26. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0210** EFM 130-145 + variability ↓ **110-120 ↓ 50's toco** duration contractions 3-5 minutes 70-80 seconds.  **Signed: J.A. (Nurse Janine Abernathy).  Progress Note**: Temperature 98, pulse 101. **Signed: J.A. (Nurse Janine Abernathy). Progress Note: Patient in with above complaints, will notify Dr. Hanna.** P 55

27. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 admitted** at **0211**.  P 55

28. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate at **0213** – "strip belonging to Burke, Tyee not Mason, Mason discharged from system, M. Schultz computer notes."  (P11 FMG)

29. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate on **11/23/02** at **0214** "received into my care from Triage, pt placed LLP, O₂ mask on, this strip belongs to Burke, Tyee, L. Levy, RN computer notes." (P11 FMG)

30. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 Physician Order Sheet: OB triage. Continuous EFM, bed rest. Medications: Pitocin per protocol dated 11/23/02** at **2:20.  Dr. Hanna, Resident.** P31

31. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**OB Flow Sheet: 11/23/02** nurse L. Levy.  External monitor **0230**. 140-150's **decelerations down to 110 x 50-60 seconds.  Patient having variables (occasional) lasting 50-60 seconds down to 110's.  Left lateral position, oxygen.** Nurse Levy.  P52

32. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**OB Flow Sheet: 11/23/02 0230** received to my care, LDR#2 at **2:14**. Patient's strip is

 

recording under Mason, Stephanie ID# 1920826.  Ms. Mason was in LDR2 prior to Ms. Burke.  Abdomen soft, non-tender on palpation.  Denies ROM or vaginal bleeding, just some spotting.  Patient in left lateral position. **Oxygen,  continued to monitor**. **L. Levy, RN**. P 53

33. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0240** FHT 140-150, + variability, **decels to 120 for 30 seconds, Pitocin explained and started at 2 MU.  Decel at 0255 down to 60's, see note on back and computer chart for interventions**. Nurse Levy. P52

34. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate on **11/23/02** at approximately **0240** Pitocin was started to be administered to Tyee Burke at Defendant, Providence Hospital.  P52

35. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate on **11/23/02** at **0256** Lactate ringers bolusing, $O_2$ already on. Dr. Hanna called to room while changing position to LLP. L. Levy, RN.  (P16 FMG)

36. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate on **11/23/02** at **0300** internal scalp lead placed per Dr. Hanna, SROM, thick meconium. Internal scalp lead not functioning, EFM used during second interval scalp lead placement, fetal heart tones audibly 90's not tracing well, fetal heart tones 90's. L. Levy, RN, computer notes – **0303** second scalp lead placed, Foley, bicitra shave, Dr. Pezeshki called. L. Levy, RN, computer notes.  (P16 FMG; P53-54 records)

## FHT at Desk Computer

37. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0254** after patient turned to RLP, **FHT noted at desk computer to be in 60's**. RN entered room immediately, patient turned to left lateral position.  **Dr. Hanna** called to room.  **Pitocin discontinued**. LR bolus, oxygen already at 10 liters. **11/23/02  0300** internal scalp lead placed per **Dr. Hanna**, thick meconium fluid noted, scant amount. **First internal scalp lead not functioning. EFM used after internal scalp lead failed**. FHT audibly 90's per myself (L. Levy, RN) and Dr. Hanna.  Second internal scalp lead placed at **0302 – 0303**.  FHT noted to be 40-50's. **Foley inserted, abdomen shaved. Dr. Pezeshki called stat.  11/23/02 Anesthesia called stat to OR#2 at 0304 for stat C-section. Signed: L. Levy, RN.  See computer for nurse's notes and interventions**.  P 53

38. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate on **11/23/02** at **0303 Dr. Pezeshki ordered a stat Cesarean section** be performed on Tyee Burke because of fetal distress / non-reassuring fetal heart tones. Nurse Levy. P53




39. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0306** to OR#2 for stat C-section. Signed: L. Levy, RN. P 52

40. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0300** OB/GYN Resident Note: Called to evaluate patient **2:56 a.m. due to deep variable**. Patient had turned herself over in bed, still receiving oxygen face mask and receiving IV fluids. **Patient re-positioned on back and scalp stimulation applied. Deep variables still persistent and internal scalp lead placed with external audible FHT 90 BPM**. Internal scalp lead not functioning properly, therefore second internal scalp lead placed with audible external **FHT 90 BPM**. ... being prepared for **stat Cesarean section**. FHT extremely audible 100 BPM. Second ISL functioning with FHT 100-110. **OR doctor Gary Mennie / Dr. Soheyla Pezeshki called to leave her delivery at 0306 a.m. to attend stat C-section. Signed: Dr. Soheyla Pezeshki / Dr. Hanna, Resident**. P 7

41. That on **11/23/02** at **0317** Marc Burke, Jr. was born by Cesarean section at Defendant Hospital.

42. *That it took 14-15 minutes to deliver Marc Burke, Jr. from the time that **Dr. Pezeshki** ordered the stat Cesarean section at **0302 / 0303** until the time that Marc Burke, Jr. was actually born at **0317** on **11/23/02** at Defendant hospital.*

43. *That Tyee Burke was at **Defendant hospital** for more than 2 hours and 20 minutes before Marc Burke, Jr. was delivered / born. An electronic fetal monitor was attached to Tyee Burke at **0055** which was recording Marc's heart rate. Marc Burke, Jr. was born at **0317** on **11/23/02**. In addition, the labor and delivery record states admitted at **0046**.*

44. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "Admission: **11/23/02 0246**. Admitting Diagnosis: Active labor pains. **Principal Diagnosis: Term pregnancy. Secondary Diagnosis: non-reassuring fetal status. Primary Cesarean section.** Attending: Dr. Soheyla Pezeshki. Signed **1/7/03**. P 1

45. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**Labor and Delivery Record**: Admitted: **11/23/02 12:46 a.m.** ROM **0300**. Delivery / Birth of Marc Burke at **0317**. AROM, abnormal FHR pattern. Apgar scores at 1 minute 0 / at 5 minutes 0 / at 13 minutes 2. Birth Weight: 5 lbs 11.8 oz. Resident physician Dr. Hanna and Dr. Mennie. Attending Physician Dr. Soheyla Pezeshki.** P 54

46. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "Surgical Record: **11/23/02** in at **3:08**. Preoperative Diagnosis**: 39 weeks, IUP, thick meconium, **abnormal FHT's**. P 50

47. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "Obstetric Discharge Summary / Admit: **11/23/02**. Delivery / Birth: **11/23/02**. Discharge: **11/30/02**. C-section, thick meconium, non-reassuring FHT**. Attending: Dr. J. Whittington IHA staff **11/30/02**. P 4

 

48. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 Addendum: Staff OB ... called at about 3:05 a.m. while I was doing another delivery. Stat C-section, patient was moved immediately to C-section in OR... C-section,** ISL attached to head showing fetal heart rate 100-110 bpm, stat C-section under general anesthesia. Short cord, thick meconium. Immediately after delivery... baby handed to NICU. **Cord Gases Ven: 6.99 / BE –18. Arterial clotted. Dr. Soheyla Pezeshki.** P 9

49. *That the records of* **Defendant hospital** *on the* **mother, Tyee Burke**, *indicate, "EFM strip. FMG 11/23/02 panel number 96193 is at approximately 0311 for the clock. General anesthesia, ISL out at 0313. The above is the FHT per ISL noted in OR2. No computer record of this section of fetal FHT's. L. Levy, RN. P 11*

50. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 0815 C-section due to fetal distress, bradycardia, agree with above. Dr. Gary Mennie.** P 15

51. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/25/02** Patient states infant **fetal heart rate down resulting in stat C-section.** P 17

52. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**Operative Report. PROCEDURE**: 11/23/2002. SURGEON: **Soheyla Pezeshki, MD. ASSISTANT: GARY MENNIE, MD AND SABRINA HANNA, MD PREOP DX**:
1. Thirty-nine week intrauterine pregnancy.
2. Meconium stained...fluid.
3. **Abnormal fetal heart tone pattern**.
**POSTOP DX**:
1. Thirty-nine week intrauterine pregnancy.
2. **Meconium stained...fluid.**
3. **Abnormal fetal heart tone pattern**.
4. Nuchal cord times one.
**OPERATION: Cesarean section**.
**ANESTHESIA: GENERAL**.
**INDICATIONS**: Thirty-nine week intrauterine pregnancy who presented to Labor and Delivery, was noted to have **abnormal fetal heart tone tracing upon amniotomy of the membranes, noted... meconium fluid. Internal scalp lead was applied at that point, noted to have fetal bradycardia into the 90s and the patient was moved back to the operating room**. Verbal consent was obtained from the patient and her husband for the caesarian section. **In the operating room fetal heart tones were noted to be in the range of 72-108. Fetal heart tones were in the mid 70s prior to general induction** of the patient for the caesarian section. **FINDINGS**: Thick ... meconium. Nuchal cord times one which was reduced prior to delivery of the infant. ...Umbilical cord was three vessel. Signed: **Soheyla Pezeshki, MD. Dictated by Gary Mennie**. P 45-47

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

53. That the records of **Defendant hospital** on the **mother, Tyee Burke**, indicate, "**11/23/02 time LDR#2 taken by … OR from wall clock**. Patient to **OR#2 for stat C-section, entered room** at **0308**. **ISL hooked to EFM** at **0309**. FHT 100-110. + STV. Unable to remove ISL, ISL out to shorter length per MDR request. **FHT monitoring off** at **0313** patient in process of being placed under general anesthetic. Skin time **0315** and 40 seconds. At **0317 male infant (Marc Burke) delivered**. Nuchal cord x 1, ISL on head. Infant handed to awaiting Peds. Resuscitation efforts initiated by **Dr. Pezeshki** and **Chloe Llamas, RN**. **No respiratory effort, no heart rate noted, chest compressions began by Chloe Llamas**, RN then this writer continued chest compressions. Infant first suctioned and intubated by **Dr. Perla, Dr. Mennie** also assisting with resuscitation. **Infant given endotracheal medications as follows**. See NICU chart for dosage as they are ones that administer drugs. **Epinephrine at** **0323**, **0327**, **0328**. **0330** FHR 140 and continued to be 140-150. **0334 sodium bicarbonate** given. umbilical catheter which was inserted was **Dr. Perla**. **0343** D10 given **per Dr. Perla**, infant flaccid and with no respiratory effort. Infant to NICU at **0347**. **Gases sent. See computer notes as well. See back of this note for OR FHT strip. L. Levy, RN**. P10

## Asphyxia

54. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "Baby Boy **Burke was born on 11/23/2002 at Providence and transferred to our NICU on the same day because of asphyxia. Born after a 39-week gestation, birth weight was 2602 grams. Prior to transfer to our Neonatal Unit, he required extensive resuscitation at delivery, including intubation, chest compressions and medications. Physical exam revealed a comatose term infant on a vent**. X-ray examination confirmed meconium aspiration. **He received …Sodium Bicarbonate, Epinephrine…. He was transferred to Children's Hospital on 11/23/2002 on IV fluids and mechanical ventilation for continued in-patient care. His problems at transfer were critical. Diagnoses at transfer were a term male infant, 39 weeks, appropriate weight for gestational age, with** perinatal asphyxia **and meconium aspiration**. P 2

55. That Dr. Dajani stated Marc Burke, Jr. has perinatal asphyxia.

56. That on **11/23/02** Marc Burke, Jr. sustained perinatal asphyxia, Dr. Rima Dajani. P2

57. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "**11/22/02 6:00 a.m.** Team called for **stat Cesarean section** for thick meconium. Infant boy (Marc Burke, Jr.) **delivered** at **0317**, limp, **no cry… no respiratory effort**, suctioned by **Dr. Perla**, obtained large amount of meconium stained fluid. **Intubated by Dr. Perla and bagged continuously**. **No HR audible. Chest compressions started continuously with continuous bagging. Epinephrine given** at the following time: **0323**, **0327**, **0326**. **HR audible at 0330** (13 minutes of age) at over 100 BPM… **sodium bicarbonate given** at **0334**. **Brought to NICU per transport with continuous**

THE LAW OFFICES OF … LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222



**bagging. No movement, no spontaneous respirations (no breathing). HR 150 BPM. Admitted to NICU at <u>0355</u>... mechanical ventilations. ... Initial oxygen saturation 60%. HR 152 BPM, no respiratory effort (no breathing). Remains flaccid, pale. ... <u>0620</u> patient started to have spontaneous respirations. <u>0640</u> Children's Hospital of Michigan transport team in. ... Oxygen saturation 96%. Still <u>no movement</u> noted. <u>0705</u> brought to Children's Hospital of Michigan by transport team." P3-4**

58. That although Marc Burke was born on <u>**11/27/02**</u> at <u>**0317**</u>, he did not start to have spontaneous breathing until <u>**0620**</u>, three hours after he was born.

59. That the records of **Defendant hospital** on the child, Marc Burke, Jr., indicate, "<u>**9/23/02 6:00 a.m.** Admitting Note and Transfer Note</u>: Born by **Emergency Cesarean section for fetal bradycardia**, thick pea soup meconium. EDC: <u>**11/20/02**</u>. **Apgar scores** 0 / 0 / 2. Cord around neck x 1. **Baby came out floppy, no movement. No heart rate at birth. Baby's airway suctioned and got some thick meconium, then intubated... positive pressure ventilation given with bag. No heart rate, chest compressions started and still no heart rate. Epinephrine given though ET tube. Chest compressions continued, no heart rate after 3rd dose of Epinephrine. Sodium bicarbonate given ...but still limp, no respirations, cold, pale, dusky. Brought the baby to the NICU and placed on vent.** Dr. Perla." P5

60. That Dr. Perla wrote in Marc Burke, Jr.'s records that he had perinatal asphyxia on <u>**11/23/02**</u>. P6

61. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "<u>**11/23/02** </u>**Floppy, no movement, no spontaneous breath sounds, pale on vent. 0 tone, no response to stimuli, term baby born with <u>perinatal asphyxia</u>. ABG: pH 6.82** / $pCO_2$ **76** / $pO_2$ **43. Baby suctioned, got meconium and bagged. pH 6.94** / $pCO_2$ **45.8** / $pO_2$ **79** / **BD –11.4. Transferred baby to Children's Hospital of Michigan.** Dr. Perla. P 6

62. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "<u>**11/23/02** </u>**EDC:** <u>**11/26/02**</u>. ROM x 17 minutes, meconium stained fluid **noted. FHT noted to take dips, mother delivered by Emergency C-section** under **general anesthesia. Birth Weight: 2602 gm. Baby came out with absent heart rate. Full resuscitation given by Dr. Perla in Delivery Room. Apgar scores 0 / 0 / 0 / 2. Transferred to NICU on assisted ventilation. Initial ABG showed combined respiratory and metabolic acidosis. Sodium bicarbonate given multiple doses. Gases: pH 6.9** / $pCO_2$ **54.8** / $pO_2$ **79** / $HCO_3$ **11.4.** Dr. Rima Dajani. P6-7

63. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "<u>**11/23/02** </u>**Term -** Newborn meconium aspiration, <u>perinatal depression</u>, rule out sepsis. **Plan**: Assisted ventilation. Continue pulse oximetery, sodium bicarbonate as needed. Maintain blood pressure, consider Dopamine if needed. **Physical Exam: Comatose, no spontaneous movement, respirations except occasional gasps.** Dr. Rima Dajani.   P 8

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

 

64. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "**11/23/02 serious condition of this baby, the chances of survival, even death, <u>also</u> <u>informed them of high risk for cerebral palsy, brain damage in case of survival</u>. Transferred the baby to Children's Hospital of Michigan for randomized in their hypothermia study**. Dr. Rima Dajani.      P 9

65. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "**11/23/02 0317 Apgar scores** 0 / 0 / 0.  Infant vital signs: **11/23/02 4 a.m**. temp 94.8 ax / apical 152.  **4:20 a.m**. apical 125. **4:40 a.m**. apical 146. P 14

66. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "**11/23/02** bag and mask started immediately. **Intubated at 0317. Chest compressions started**: **0318**. Stopped: **0330**.   P 15

67. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "**Birth**: **11/23/02 0317. Weight: 5 lbs 11.8 oz. GA 39+. Neuro: flaccid / no muscle tone**. Dr. Rima Dajani.  P16

68. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "**11/23/02 4:30 Blood culture: <u>no growth</u> to date**. P 18

69. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "**11/23/02 4:15-4:45** bagging 100%. **5:20-5:30** bagging 100%. **6:20** began spontaneous respirations. Children's Hospital via transport team.  P 21

70. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, who was born on **11/23/02** at **0317** indicate:
    Blood Gas:

| Date / Time | ph | $PCO_2$ | $PO_2$ | $HCO_3$ | BE | $SHCO_3$ |
|---|---|---|---|---|---|---|
| **11/23/02 4:35** | 6.82 | 76.8 | 43.0 | 12.2 | -24 | 8.1 |
| **11/23/02 5:30** | 6.94 | 54.8 | 79.4 | 11.4 | -21.4 | 9.7 |
| **11/23/02 6:46** | 7.23 | 24.6 | 104.7 | 10.2 | -15 | 13.5 |

(P 24)

71. That the records of **Defendant hospital** on the **child, Marc Burke, Jr.**, indicate, "**11/23/02 skeletal flaccid / neuromuscular flaccid**. P 42

## Children's Hospital of Michigan

72. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**Admission: 11/23/02. Discharge: 12/22/02**."  P 1

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

73. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**11/24/02** place patient on **ECMO**. P 5

74. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**Discharge Summary. Birth Weight: 2602 gm. GA by dates: 39** wks 4 days. AGA. **Apgar scores** 0 / 0 / 2. P 12

## Asphyxia

75. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**11/23/02 Chief Complaint**: Transferred to Children's Hospital of Michigan NICU …at 4 hours of age for meconium aspiration syndrome with **asphyxia and entrance into hypothermia cooling study. Baby born by Emergency Cesarean section for fetal bradycardia with thick pea soup meconium, cord around neck at 39 weeks' gestation. Birth Weight: 2602 gm**… **fetal bradycardia.** Delivered by Emergency Cesarean section under general anesthesia. Rupture of membranes 17 minutes. **Baby was limp, no cry, no respirations,** large amount of meconium fluid. **Bagged, no heart rate, chest compressions, Apgar scores 0 at 1 minute / 0 at 5 minutes / 0 at 10 minutes / 2 at 15 minutes. 4:30** Cord Gases: pH 6.99 / BE –18. **4:35 Initial ABG: pH 6.82** / pCO$_2$ 76.8 / pO$_2$ 243 / HCO$_3$ 12.2. **5:30 repeat Gases: pH 6.94** / pCO$_2$ 54.8 / pO$_2$ 79.4. / HCO$_3$ 11.4." P13-14

76. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "Hypothermic. Physical Exam: General – **comatose, no response to pain**." P15

## Asphyxia

77. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "1-day-old MAS, PPHN. **Asphyxia on hypothermia trial**, follow protocol if additional seizures load with Phenobarbital.  On Dobutamine / Dopamine. P 17

78. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**A/P: asphyxia – currently on hypothermia trial**. P 24

79. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**Newborn male with hypoxia**.  P 174

80. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**ULTRASOUND HEAD ON 11/23/02. IMPRESSION: 1. PERIVENTRICULAR ECHOGENICITY, SUGGESTING CEREBRAL EDEMA.** 2. SMALL CHOROID PLEXUS CYSTS VERSUS GERMINOLYSIS OR EVEN THE POSSIBILITY OF PRIOR GERMINAL MATRIX HEMORRHAGE. P175

THE THURSWELL LAW FIRM, P.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

-11-

 

81. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**11/24/02**. ECMO cannulation. P 147

82. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**11/25/02**. **ULTRASOUND HEAD: Impression:  1. THE PREVIOUSLY DESCRIBED PERIVENTRICULAR ECHOGENICITY IS NOT SEEN ON THE CURRENT STUDY**. P 446

83. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**11/25/02** Blood culture  <u>no</u> growth 4 days.  P 502

84. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**11/26/02**.  ULTRASOUND - HEAD: IMPRESSION: <u>NO</u> DEFINITE EVIDENCE OF INTRACRANIAL HEMORRHAGE. P 185

85. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**11/27/02** ULTRASOUND HEAD ON **11/27/02** AT **0900** IMPRESSION: RESOLVING GRADE-I HEMORRHAGE BILATERALLY.  2. <u>NO</u> NEW HEMORRHAGE IS NOTED. P 187

86. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "US Head **11/27/02**. IMPRESSION: 1. **RESOLVING GRADE-I HEMORRHAGE BILATERALLY**. 2. NO NEW HEMORRHAGE IS NOTED. **IMPRESSION**: THERE HAS BEEN A SLIGHT INCREASE IN THE SIZE OF THE LATERAL VENTRICLES, ALTHOUGH THEY ARE STILL WITHIN NORMAL LIMITS. NO OTHER CHANGES ARE SEEN COMPARED TO **NOVEMBER 27, 2002**. P 449-450

87. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**11/28/02**. ULTRASOUND OF THE HEAD: IMPRESSION: THERE HAS BEEN A **SLIGHT INCREASE IN THE SIZE OF THE LATERAL VENTRICLES**, ALTHOUGH THEY ARE STILL WITHIN NORMAL LIMITS. NO OTHER CHANGES ARE SEEN COMPARED TO **NOVEMBER 27, 2002**. P 189

88. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**11/29/02**.  ULTRASOUND HEAD. CLINICAL HISTORY: 6-day-old... **IMPRESSION**: 1. MILD DISTENTION OF THE LATERAL AND THIRD VENTRICLES WITH NO EVIDENCE OF ACUTE HEMORRHAGE. 2. FLUID IS SEEN IN THE INTERHEMISPHERIC FISSURE. P 191 & 451

### Perinatal Severe Asphyxia

89. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**12/9/02**. **MRI OF THE BRAIN: CLINICAL**: Two-week-old male

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

 

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

hypothermia, status post ECMO, **born with perinatal severe asphyxia.**
**IMPRESSION: 1. FINDINGS COMPATIBLE WITH SUBACUTE BLOOD**
**PRODUCTS OR CALCIFICATION IN THE BILATERAL BASAL GANGLIA**
**AND THALAMI LIKELY SECONDARY TO ASPHYXIA**. NO OTHER AREA
OF ACUTE HEMORRHAGE OR INFARCT ON THE DIFFUSION-WEIGHTED
IMAGES. 2. SLIGHT PROMINENCE OF THE VENTRICULAR SYSTEM AND
EXTRAAXIAL SPACES, LIKELY SECONDARY TO ECMO. COMMUNICATING
HYDROCEPHALUS IS CONSIDERED LESS LIKELY BUT CLOSE CLINICAL
CORRELATION IS ADVISED. 3. PROMINENCE OF THE LEFT JUGULAR VEIN
LIKELY SECONDARY TO ECMO. P 198-199

90. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**,
indicate, "**12/18/02**. **ULTRASOUND HEAD. IMPRESSION**: 1. NO EVIDENCE OF
ACUTE INTRACRANIAL HEMORRHAGE. 2. THERE IS MILD DILATATION
TO THE LATERAL VENTRICLES, SLIGHTLY MORE PROMINENT THAN
PRIOR STUDY. P 202

## Hypoxic-Ischemic Encephalopathy

91. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**,
indicate, "**12/20/03**. **Diagnosis**: **hypoxic-ischemic encephalopathy**. Prescription for
outpatient occupational therapy. Problems: Sucking and coordination. P 143

92. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**,
indicate, "**CLINICAL**: Dysphagia with poor swallowing and gag reflux, for G-tube
workup. P 203

93. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**,
indicate, "**Cerebral palsy**." P 226

94. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**,
indicate, "**3/17/04**. **CT Head. FINDINGS**: 1. **The brain evaluation** shows areas of
hypodensity of the white matter surrounding both of the ventricular trigone, likely
representing a delay in the myelination. The size of the upper tentorial portion of the
ventricular system is larger than normal. There is no midline shift or mass-effect. The
periencephalic CSF spaces are normal. P 913

95. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**,
indicate, "**4/2/04** **39 weeks, C-section, hypoxia, bradycardia**. P 255

## Encephalopathy Due to Hypoxia at Birth

96. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**,
indicate, "**4/5/04** **encephalopathy due to hypoxia at birth**. P 256




97. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**4/5/04**. **PREOPERATIVE DIAGNOSIS**: 1. Left hip dysplasia / dislocation. 2. Left adductor contracture. 3. Cerebral palsy. **POSTOPERATIVE DIAGNOSIS**: I. Left hip dysplasia / dislocation. **PROCEDURE PERFORMED**: 1. Left hip open reduction with proximal femoral shortening osteotomy. 2. Left adductor lengthening, open. P 931-932

98. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**Postoperative Diagnosis**: cerebral palsy, left hip dislocation. P 259

99. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**Discharge Summary. Admission**: **4/10/04**. **Discharge**: **4/11/04**. **Diagnosis**: Respiratory distress. **HISTORY**: Marc is a 16-month-old African-American child with **a past medical history significant for hypoxic ischemic encephalopathy**, recently admitted on April 5th for orthopedic procedure of pinning of hip secondary to hip dysplasia. P 954

100. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**4/16/04 CP secondary to HIE** (hypoxic-ischemic encephalopathy). P 339

101. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**4/15/04 developmental delay**. P 371

102. That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**9/24/04. HISTORY**: Patient was accompanied to therapy evaluation by mother, who provided the following history. Marc was born full term at 39 weeks via emergency C-section. **Mother reported complications in a decreased fetal heart rate, and infant flat lined for approximately 15 minutes. He was revived and then transferred to Children's Hospital of Michigan. He was a part of a hypothermia study**, was on ECMO for 5 days and required an ICU stay of 1 month. **Marc sustained I seizure when he was days old**, no reported seizure activity since. **He was NG tube fed for approximately 3 months**: He is not currently on any medications. **He has an activity chair, a bath chair**. Mother reports that she will be attending seating clinic to make adjustments to his car seat and to see about receiving a stroller or wheelchair. **He currently is enrolled in Early On** for both center based and home based. He presently requires total to maximal assistance to maintain head and trunk control. Additionally, he requires total assistance for attaining, maintaining, and transitioning between all developmental milestones, i.e. Prone on elbows, prone on extended elbows, rolling supine to and from prone, sidelying, sidesitting, ring sitting, four point, tall kneeling. He displays increased tone in bilateral upper extremities and face. He has low tone in trunk. He does not currently reach for objects presented at midline and holds his bilateral hands in a cortical thumb tuck. He presently wears a patch on his left eye approximately 8 hours a day to strengthen his right eye. **There is a delay in horizontal and vertical tracking; however he does follow, especially**

 

**with lights and sound. He underwent hip displacement surgery in April of 2004.**
P399

103.     That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**ASSESSMENT: Marc is a 2 year old male diagnosed with cerebral palsy.** He was referred to occupational therapy services for oral motor stretching. He displays poor head and trunk control needed for optimal feeding positioning. He also has increased oral facial tone which significantly compromises his ability to safely organize and manipulate food, thus reducing oral nutritive intake. His mandibular joint does not open more than 2 mm following firm pressure. When oral stimulation is provided, Marc becomes agitated, which subsequently increases his oral facial tone. **He would benefit from occupational therapy services to address the following goals which were established in collaboration with his mother.** P401

104.     That the records of **Children's Hospital of Michigan** on the **child, Marc Burke**, indicate, "**Past Medical History- born via emergency C-section because of fetal distress, it took them 15 minutes to have the baby out and patient suffered from hypoxia.** Patient was full-term, stayed in NICU for about one month. P 1048

## DETROIT PUBLIC SCHOOL RECORDS

105.     That the records of **Detroit Public Schools** on the **child, Marc Burke**, indicate, "**10/8/03 11-month-old** male who has participated in the **Early Intervention program of Detroit Public Schools** since **September 2003**. Marc has a **diagnosis of Spastic Quadriplegia, gastro esophageal reflux, and hypoxic ischemic encephalopathy.** Marc presents with increased tone in his extremities but decreased tone in his trunk impairing his ability to sit independently. Marc is functioning at a three month level for fine motor functioning and a two month level for gross motor functioning." P5

106.     That the records of **Detroit Public Schools** on the **child, Marc Burke**, indicate, "PARENT REPORT: Marc was born full term with birth weight of 5 lb 10 oz. **At Providence Hospital. The baby's heart stopped beating during the labor and delivery. Within six hours of delivery he was transferred to Children's Hospital of Michigan.** He was placed on a ventilator and cooling down of brain was performed in order to minimize brain damage. He had one seizure, was fed via IV and required three blood transfusions. His current **diagnoses are spastic quadriplegic** and failure to thrive. Marc has hand splints and neck brace. He is followed at the **Development Assessment Clinic of Children's Hospital**. Marc will resume physical therapy in August of 2003. He sucks well from a bottle, is fed rice cereal, oatmeal and some fruits and is now gaining weight Polycose is added to his formula. His current weight is 14 lbs. March makes noises, smiles, laughs and cries to make needs known. He has a regular bedtime, sleeps through the night and naps. He sees well. ...Parents are concerned with Marc's total development. P 6

THE HORGAN LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222



107. That the records of **Detroit Public Schools** on the **child, Marc Burke**, indicate, "**3/8/04**. Marc is a **1.4-year-old male with a diagnosis of spastic quadriplegia, hypoxic-ischemic encephalopathy and meconium aspiration**. P 10

## Lexington School Records

108. That the records of **Lexington Schools** on the **child, Marc Burke**, indicate, "Age 3. Evaluation **12/9/05**. **Reason for Referral**: Marc was referred to the preschool program for children with disabilities because he has **spastic quadriplegic cerebral palsy**.... He recently **relocated to Columbia from Michigan. During labor, Marc was in distress and loss oxygen for approximately 15 minutes before he was delivered by emergency Cesarean section.** After birth he was not breathing on his own and he also aspirated on the meconium. At three days old he had a seizure and there was bleeding in the brain. Marc remained in the NICU for 1 month before coming home." P1

109. That the records of **Lexington Schools** on the **child, Marc Burke**, indicate, "**1/7/08** The AEPS assesses social-communication, cognitive, line and gross motor skills. I used the birth-three-year-old assessment. **Marc received a raw score in the social domain of 1/50. In the adaptive domain, he received a score of 3/64. In the cognitive area, his raw score was 7/116.** P3

110. That the records of **Lexington Schools** on the **child, Marc Burke**, indicate, "**1/8/08** Marc received a **Developmental Age Equivalency of 6 months on this instrument**. His motor impairments interfere with his performance in the assessment of this area of development. He is currently visually following adults across the room when they are holding his favorite Big Macs. He will also follow the Big Macs when they disappear from view. He is not yet searching for hidden items. P3

111. That the records of **Lexington Schools** on the **child, Marc Burke**, indicate, "**Gross Motor Skills 1/10/08**. As measured by the AEPS Level 1, Marc's gross motor skills are failing at a 5-6 month level. He is able to log roll from prone to supine and back with occasional assistance needed to free his arm. **He requires maximum assistance** to be positioned in either long sitting or bench sitting. Once positioned, he can maintain sitting with support to maintain his upper extremities in a weight-bearing position for up to 10-15 seconds. He is beginning to push to standing with minimal to moderate assistance. He is inconsistently tolerating his prone stander for up to 30 minutes one day a week." P4

## Richland School District

112. That the records of the **Richland School District** on **Marc Burke** indicate, "Evaluation Date: **9/17/08**. Date of Birth: **11/23/02**. Age: 5-9. Self Contained Class for Severe (Profound) Mental Disability. Bayley Scales of Infant Development (**12-09-2005**) Age Equivalent = 3 Months. Speech/Language: Enrolled in Therapy. Marc is a child with multiple disabilities.

THE ——————— LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222



**Developmental Profile II. Vineland Adaptive Behavior Scales Second Edition.**
**The Developmental Profile II is a rating scale that evaluates a child's growth and**
development across five domains. Marc's teacher, Mr. Brazell, completed the scale.
**Below are age equivalent scores for Marc for each domain.**

| Domain | Age Score |
|---|---|
| Physical | 2 months |
| Self-help | 8 months |
| Social | 12 months |
| Academic | 6 months |
| Communication | 2 months |

The Developmental Profile indicates that Marc has severe delays across all areas of
**development assessed.**
**The parent Caregiver Rating Form was administered.**

| Domain | Standard Score | Age Equivalent |
|---|---|---|
| Communication | 42 | <12 months |
| Daily Living Skills | 34 | <7 months |
| Socialization | 51 | <7 months |
| Motor | 28 | <5 months |

Adaptive Behavior Composite 38
Standard Scores between 90 and 110 are in the Average range. Scores should be
**interpreted carefully as some observations may be based on estimated**
**performance. Marc's ratings on the Vineland indicate that he has significant**
**weaknesses across all areas of adaptive behavior assessed. Marc's adaptive**
**behavior skills are significantly** below those of other children his age. Compared to
other children his age Marc is much **more dependent on others for care, assistance**
**and supervision to insure his health and safety. Marc is totally dependent on**
**others.**
**Summary and Recommendations:** Marc Burke is a five-year-old student attending
Sandel Elementary School. Previous assessment by Richland Lexington School
District Five indicates that Marc has **severe delays** in the development of cognitive
skills and adaptive behavior skills. This **evaluation indicates that Marc has severe**
**delays in the development of adaptive** behavior skills and general levels of
development. Marc's assessed developmental delays do not appear to be primarily due
to a lack of instruction; or the result of visual, hearing, or motor disability; limited
English proficiency; **cultural difference or of environmental or economic**
**disadvantage.** Marc is a child with multiple disabilities with motor disability
contributing to, but not the primary factor in his developmental delays. Marc's
developmental delays will have a severe adverse affect on his ability to participate in
and progress in the regular classroom setting and curriculum. Marc's developmental
delays adversely affect his education to the degree that he cannot perform academic
work at the level and pace of his same aged peers. **Marc requires a specially**
**designed individualized educational program focusing on cognitive, language,**
**sensory and physical stimulation and functional communication in an**
**environment that supports his significant** medical needs. … Marc Burke be
considered for eligibility in a special education program as a student with a Severe
Mental Disability. **Michael Coxe, School Psychologist, II.**" Page B4-B7

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

 

113.    That the records of the **Richland School District** on **Marc Burke** indicate, "IEP meeting: **4/21/10**. School Year: **2010-2011**. Marc has difficulties accessing curriculum and materials due to cognitive and physical challenges. By contrast his non-disabled peers are accessing content via lengthy reading and writing assignments. P.T. Note for **2009-10** progress: Marc has tolerated the supine stander fairly well this year. He usually tolerates 20-25 minute sessions to about 60-80 degrees upright. He also is on the mat for alternative positioning and seems to enjoy this time of his day, and the classroom staff is fairly consistent in letting Marc out of his wheel chair to be on the mat Marc's weakness is his inability to effectively control his extremities to perform a functional activity such as sitting, standing, playing prone on elbows, or reaching efficiently for some item of interest However, his strength is that he is able to move his body and he is trying to control his environment to the best of his abilities. **He can reposition himself on the mat, roll from supine to prone with very little assist to clear arm from under him**; tolerate stander about 25 minutes without severe problems; and hold prone on elbows for a short period. Adapted Physical Education: Marc requires full prompting, modified equipment and an adapted program to participate in all recreation-leisure activities. He remains in his wheelchair for the duration of class sessions. **Occupational Therapy:** Marc tolerates stimulation prior to feeding times. He continues not show an active swallow, good head control or lip closure. The therapist holds head, under bottom lip and presents food with decreased resistance from last year. He continues to not accept more than 3-4 spoonfuls of pureed food at a time. **Speech** - Marc has delays in expressive/receptive communication which affects his ability to communicate in the general classroom which peers his age. His delays have an effect on his social and functional communication. **4/21/10 Findings**: Marc makes good eye contact when interacting with adults. He is alert for therapy and can attend to therapy for a given amount of time. He responds to sounds and voices. He has a strong awareness of adults and caregivers in the classroom. Marc makes purposeful attempts to trigger communication output devices and interact with picture books read to him. He is able to eye gaze when looking at story books and can point to pictures with maximal hand over hand assist Marc enjoys finger play and having songs sung to him. He attempts at times to interact with surrounding classmates. **Marc makes discomfort, pain or dislikes known by crying and smiles when pleased or happy**.

| Areas of Assessment | Date | Method of Assessment | Findings |
|---|---|---|---|
| Fundamental | **3/25/10** | Vineland Adaptive Behavior Scales and Progress Reports | Age equivalencies are roughly 7 months. |
| Community | **3/25/10** | Vineland Adaptive Behavior Scales and Progress Reports | Age equivalencies are about 9 months. |
| Domestic | **3/25/10** | Vineland Adaptive Behavior Scales and Progress Reports | Age equivalences are about 2 months. |

THE THURSWELL LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

| Vocational | __3/25/10__ | Vineland Adaptive Behavior Scales and Progress Reports | Age equivalencies are at about 5 months. |
| Gross Motor / physical therapy | __4/20/10__ | Functional Performance Assessment and PT observation data. | He does have some independent mobility on the mat to roll from supine to prone, brief prone on elbows and he tolerates the stander for about 20-30 minute. …. He is completely non-verbal and tracks objects inconsistently. The classroom staff allows him to be out of his wheel chair on the mat for freedom of movement, under close supervision. He scored Level I/V on the Functional Performance Assessment. |
| Occupational therapy | __4/1/10__ | Pediatric Evaluation of Disability Inventory (Self care domain), therapist observations. | He continues to resist spoon with food presented to him however decreased from last year. He continues to require assistance for head positioning, lip closure and opening mouth to place small spoon with pureed food. He is not actively swallowing when food is placed in his mouth. |
| Recreation / leisure and adapted PE | __4/21/10__ | Documented Observation | He needs to continue to work on grasping and releasing. |

Page B12-B15

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

114.    That **Defendant Hospital** has the original or a copy of Plaintiff, Marc Burke, Jr.'s medical records for **11/23/02** in its possession or control.

115.    That **Defendant Hospital** has the original or a copy of Plaintiff, Tyee Burke's medical records for **11/23/02** in its possession or control.

116.    That **Defendant Hospital** has the original or a copy of Plaintiff, Tyee Burke, medical records and fetal monitoring graphs for the inpatient period of **11/23/02** in its possession or control.

117.    That at all times material herein, a patient-doctor relationship existed between Plaintiffs and Dr. Hanna.

118.    That at all times material herein, a patient-doctor relationship existed between Plaintiffs and Dr. Taylor.

119.    That at all times material herein, a patient-doctor relationship existed between Plaintiffs and Dr. Pezeshki.

120.    That at all times material herein, a patient-doctor relationship existed between Plaintiffs and Dr. Mennie.

121.    That at all times material herein, a patient-doctor relationship existed between minor Plaintiff and Dr. Dajini.

122.    That at all times material herein, a patient-doctor relationship existed between minor Plaintiff and Dr. Perla.

123.    That at all times material herein, a patient-nurse relationship existed between Plaintiffs and Nurse L. Levy.

124.    That at all times material herein, a patient-nurse relationship existed between Plaintiffs and Nurse Abernathy.

125.    That at all times material herein, Dr. Pezeshki was the agent, servant and/or employee, either real or ostensible, of Defendant Hospital.

126.    That at all times material herein, Dr. Hanna was the agent, servant and/or employee, either real or ostensible, of Defendant Hospital.

127.    That at all times material herein, Dr. Taylor was the agent, servant and/or employee, either real or ostensible, of Defendant Hospital.

128.    That at all times material herein, Dr. Mennie was the agent, servant and/or employee, either real or ostensible, of Defendant Hospital.

 

129. That at all times material herein, Dr. Dajini was the agent, servant and/or employee, either real or ostensible, of Defendant Hospital.

130. That at all times material herein, Dr. Perla was the agent, servant and/or employee, either real or ostensible, of Defendant Hospital.

131. That at all times material herein, Nurse Levy was the agent, servant and/or employee, either real or ostensible, of Defendant Hospital.

132. That at all times material herein, Nurse Abernathy was the agent, servant and/or employee, either real or ostensible, of Defendant Hospital.

133. That at all times material herein, there was a patient-doctor relationship between doctors and nurses who cared for Plaintiffs at Defendant Hospital which doctors and nurses were the agents, servants or employees of Defendant Hospital, either real or ostensible.

134. That at all times material herein, Defendant, Dr. Hanna, was a physician duly licensed to practice medicine in the State of Michigan.

135. That at all times material herein, Defendant, Dr. Taylor, was a physician duly licensed to practice medicine in the State of Michigan.

136. That at all times material herein, Defendant, Dr. Pezeshki, was a physician duly licensed to practice medicine in the State of Michigan.

137. That at all times material herein, Defendant, Dr. Mennie, was a physician duly licensed to practice medicine in the State of Michigan.

138. That at all times material herein, Dr. Perla, was a physician duly licensed to practice medicine in the State of Michigan.

139. That at all times material herein, Dr. Dajini, was a physician duly licensed to practice medicine in the State of Michigan.

140. That when Plaintiffs were admitted to Defendant Hospital, Plaintiffs were not admitted by their private doctor, but were admitted as staff patients and a doctor or doctors were assigned pursuant to hospital procedures, by Defendant Hospital to care for Plaintiffs and said doctors were the agents, servants and/or employees of said Defendant Hospital, either real or ostensible.

141. That Dr. Hanna was the agent, servant or employee of Defendants, either real or ostensible, and was acting in the course and scope of said employment when said doctor treated Plaintiffs and violated the standard of practice of her profession in the care and treatment of Plaintiffs as stated herein.

THE THURSWELL LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

142.    That Dr. Taylor was the agent, servant or employee of Defendants, either real or ostensible, and was acting in the course and scope of said employment when said doctor treated Plaintiffs and violated the standard of practice of his profession in the care and treatment of Plaintiffs as stated herein.

143.    That Dr. Pezeshki was the agent, servant or employee of Defendants, either real or ostensible, and was acting in the course and scope of said employment when said doctor treated Plaintiffs and violated the standard of practice of his profession in the care and treatment of Plaintiffs as stated herein.

144.    That Dr. Mennie was the agent, servant or employee of Defendants, either real or ostensible, and was acting in the course and scope of said employment when said doctor treated Plaintiffs and violated the standard of practice of his profession in the care and treatment of Plaintiffs as stated herein.

145.    That Defendant Hospital and/or St. John Health are Michigan corporations, authorized to do business in the State of Michigan.

146.    That Defendants Hospital and/or St. John Health are liable to Plaintiffs herein under the doctrine of respondeat superior, for the malpractice of their agents, servants and/or employees, either real or ostensible as alleged herein.

## STANDARD OF CARE
## DOCTOR

147.    That at all times material herein, Defendant, **Dr. Sabrina Hanna**, owed duties to Plaintiffs pursuant to the patient-doctor relationship that existed between them and **pursuant to the standard of practice or care of her profession:**

    a.  To exercise reasonable skill and diligence to timely request and demand the presence of the attending  physician immediately to evaluate the mother and minor fetal Plaintiff and fetal monitoring graph.

    b.  To exercise reasonable skill and diligence to timely diagnose non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

    c.  To exercise reasonable skill and diligence to timely order and/or perform intrauterine resuscitation with the administration of oxygen and IV hydration and/or changing the position of Plaintiff mother.

    d.  To exercise reasonable skill and diligence to timely and periodically, properly review, interpret and evaluate the fetal monitoring strip that was produced herein either in person or at the nursing station where the fetal monitoring graph was appearing on the monitor.

THE HANNAH LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

e. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section.

f. To exercise reasonable skill and diligence to timely and properly review, interpret the electronic fetal monitoring graph at the nursing station when the electronic fetal monitor began to sound and/or gave a color alert.

g. To exercise reasonable skill and diligence to timely set and/or order the setting of the audible alert and/or color alert on the electronic fetal monitor at the nursing station to alert the nurses, doctors and others of a fetal heart rate below 110 beats per minute.

h. To exercise reasonable skill and diligence to timely shut off / discontinue the administration of Pitocin / Oxytocin when fetal distress and/or non-reassuring fetal heart tones or patterns appeared on the electronic fetal heart monitor.

i. To exercise reasonable skill and diligence to timely, properly and periodically review and/or timely evaluate properly the fetal monitoring graph at the nursing station and/or bedside that was produced herein to recognize non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

j. To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit: timely order and/or perform delivery herein.

k. To timely request a crew and anesthesia to come stat so that a stat C-section could be performed stat.

l. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section so as to prevent hypoxia and/or ischemia and/or asphyxia from resulting in brain damage to minor Plaintiff.

m. To exercise reasonable skill and diligence in the presence of non-reassuring fetal heart tones, fetal distress to timely shut off / discontinue the administration of Pitocin / Oxytocin, which was causing contractions and increasing hypoxia and/or ischemia to the Plaintiff fetus.

n. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section and/or timely offer the patient mother the opportunity to have a stat C-section.

o. To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions.

p. To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions, to-wit: fetal distress / non-reassuring fetal heart tones or fetal heart rate patterns.

THE THOMPSON LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

q. To exercise reasonable skill and diligence to timely treat Plaintiffs' conditions.

r. To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit: fetal distress / non-reassuring fetal heart tones / patterns.

s. To exercise reasonable skill and diligence to timely diagnose late decelerations of the fetal heart rate and/or variable decelerations of the fetal heart rate on the fetal monitoring graph.

t. To exercise reasonable skill and diligence to timely recognize decrease and/or absence in beat-to-beat fetal heart rate variability.

u. To exercise reasonable skill and diligence to immediately deliver Plaintiff minor.

v. To exercise reasonable skill and diligence to timely order and/or place a fetal scalp electrode and/or intrauterine pressure catheter to more accurately monitor the fetal heart rate and fetal heart rate patterns and to more accurately monitor the strength of the contractions.

w. To exercise reasonable skill and diligence to timely order a stat Cesarean section for non-reassuring fetal heart rates and/or patterns and/or fetal distress, i.e. repetitive variable decelerations and/or late decelerations and/or a decrease or absence of beat-to-beat variability of the fetal heart rate and/or bradycardia.

x. To exercise reasonable skill and diligence to timely inform the attending physician immediately of the non-reassuring fetal heart rates / patterns / fetal distress.

y. To exercise reasonable skill and diligence to timely request a crew to perform a potential stat Cesarean section, i.e. request the immediate presence of anesthesia, nurses and physicians.

z. To exercise reasonable skill and diligence to immediately discontinue the administration of Oxytocin / Pitocin when non-reassuring fetal heart tones appeared.

**STANDARD OF CARE**
**DOCTOR**

**148.** That at all times material herein, Defendant, Dr. Glenn Taylor owed duties to Plaintiffs pursuant to the patient-doctor relationship that existed between them and **pursuant to the standard of practice or care of his/her profession:**

THE THOMSWELL LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222



a. To exercise reasonable skill and diligence to timely request and demand the presence of the attending physician immediately to evaluate the mother and minor fetal Plaintiff and fetal monitoring graph.

b. To exercise reasonable skill and diligence to timely diagnose non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

c. To exercise reasonable skill and diligence to timely order and/or perform intrauterine resuscitation with the administration of oxygen and IV hydration and/or changing the position of Plaintiff mother.

d. To exercise reasonable skill and diligence to timely and periodically, properly review, interpret and evaluate the fetal monitoring strip that was produced herein either in person or at the nursing station where the fetal monitoring graph was appearing on the monitor.

e. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section.

f. To exercise reasonable skill and diligence to timely and properly review, interpret the electronic fetal monitoring graph at the nursing station when the electronic fetal monitor began to sound and/or gave a color alert.  .

g. To exercise reasonable skill and diligence to timely set and/or order the setting of the audible alert and/or color alert on the electronic fetal monitor at the nursing station to alert the nurses, doctors and others of a fetal heart rate below 110 beats per minute.

h. To exercise reasonable skill and diligence to timely shut off / discontinue the administration of Pitocin / Oxytocin when fetal distress and/or non-reassuring fetal heart tones or patterns appeared on the electronic fetal heart monitor.

i. To exercise reasonable skill and diligence to timely, properly and periodically review and/or timely evaluate properly the fetal monitoring graph at the nursing station and/or bedside that was produced herein to recognize non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

j. To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit: timely order and/or perform delivery herein.

k. To timely request a crew and anesthesia to come stat so that a stat C-section could be performed stat.

l. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section so as to prevent hypoxia and/or ischemia and/or asphyxia from resulting in brain damage to minor Plaintiff.

THE THURSWELL LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

-25-

m. To exercise reasonable skill and diligence in the presence of non-reassuring fetal heart tones, fetal distress to timely shut off / discontinue the administration of Pitocin / Oxytocin, which was causing contractions and increasing hypoxia and/or ischemia to the Plaintiff fetus.

n. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section and/or timely offer the patient mother the opportunity to have a stat C-section.

o. To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions.

p. To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions, to-wit: fetal distress / non-reassuring fetal heart tones or fetal heart rate patterns.

q. To exercise reasonable skill and diligence to timely treat Plaintiffs' conditions.

r. To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit: fetal distress / non-reassuring fetal heart tones / patterns.

s. To exercise reasonable skill and diligence to timely diagnose late decelerations of the fetal heart rate and/or variable decelerations of the fetal heart rate on the fetal monitoring graph.

t. To exercise reasonable skill and diligence to timely recognize decrease and/or absence in beat-to-beat fetal heart rate variability.

u. To exercise reasonable skill and diligence to immediately deliver Plaintiff minor.

v. To exercise reasonable skill and diligence to timely order and/or place a fetal scalp electrode and/or intrauterine pressure catheter to more accurately monitor the fetal heart rate and fetal heart rate patterns and to more accurately monitor the strength of the contractions.

w. To exercise reasonable skill and diligence to timely order a stat Cesarean section for non-reassuring fetal heart rates and/or patterns and/or fetal distress, i.e. repetitive variable decelerations and/or late decelerations and/or a decrease or absence of beat-to-beat variability of the fetal heart rate and/or bradycardia.

x. To exercise reasonable skill and diligence to timely inform the attending physician immediately of the non-reassuring fetal heart rates / patterns / fetal distress.

 

y.  To exercise reasonable skill and diligence to  timely request a crew to perform a potential stat Cesarean section, i.e. request the immediate presence of anesthesia, nurses and physicians.

z.  To exercise reasonable skill and diligence to immediately discontinue the administration of Oxytocin / Pitocin when non-reassuring fetal heart tones appeared.

## STANDARD OF CARE
## DOCTOR

149.    That at all times material herein, Defendant, Dr. Soheyla Pezeshki owed duties to Plaintiffs pursuant to the patient-doctor relationship that existed between them and **pursuant to the standard of practice or care of his/her profession:**

a.  To exercise reasonable skill and diligence to timely respond and be present immediately to evaluate the mother and minor fetal Plaintiff and fetal monitoring graph when told of abnormal fetal heart rates and/or patterns.

b.  To exercise reasonable skill and diligence to timely diagnose non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

c.  To exercise reasonable skill and diligence to timely order and/or perform intrauterine resuscitation with the administration of oxygen and IV hydration and/or changing the position of Plaintiff mother.

d.  To exercise reasonable skill and diligence to timely and periodically, properly review, interpret and evaluate the fetal monitoring strip that was produced herein either in person or at the nursing station where the fetal monitoring graph was appearing on the monitor.

e.  To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section.

f.  To exercise reasonable skill and diligence to timely and properly review, interpret the electronic fetal monitoring graph at the nursing station when the electronic fetal monitor began to sound and/or gave a color alert.  .

g.  To exercise reasonable skill and diligence to timely set and/or order the setting of the audible alert and/or color alert on the electronic fetal monitor at the nursing station to alert the nurses, doctors and others of a fetal heart rate below 110 beats per minute.

h.  To exercise reasonable skill and diligence to timely shut off / discontinue the administration of Pitocin / Oxytocin when fetal distress and/or non-reassuring fetal heart tones or patterns appeared on the electronic fetal heart monitor.

-27-

THE TRONGALL LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

i.  To exercise reasonable skill and diligence to timely, properly and periodically review and/or timely evaluate properly the fetal monitoring graph at the nursing station and/or bedside that was produced herein to recognize non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

j.  To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit: timely order and/or perform delivery herein.

k.  To timely request a crew and anesthesia to come stat so that a stat C-section could be performed stat.

l.  To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section so as to prevent hypoxia and/or ischemia and/or asphyxia from resulting in brain damage to minor Plaintiff.

m.  To exercise reasonable skill and diligence in the presence of non-reassuring fetal heart tones, fetal distress to timely shut off / discontinue the administration of Pitocin / Oxytocin, which was causing contractions and increasing hypoxia and/or ischemia to the Plaintiff fetus.

n.  To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section and/or timely offer the patient mother the opportunity to have a stat C-section.

o.  To exercise reasonable skill and diligence to tell those telling her of abnormal fetal heart rates or patterns to have another staff physician to come immediately and evaluate and treat Plaintiffs, if she was unable to come immediately to evaluate and treat Plaintiffs.

p.  To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions, to-wit: fetal distress / non-reassuring fetal heart tones or fetal heart rate patterns.

q.  To exercise reasonable skill and diligence to timely advise the OB/GYN resident to immediately perform a C-section in her absence because of non-reassuring fetal heart rates and patterns.

r.  To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit:  fetal distress / non-reassuring fetal heart tones / patterns.

s.  To exercise reasonable skill and diligence to timely diagnose late decelerations of the fetal heart rate and/or variable decelerations of the fetal heart rate on the fetal monitoring graph.

t. To exercise reasonable skill and diligence to timely recognize decrease and/or absence in beat-to-beat fetal heart rate variability.

u. To exercise reasonable skill and diligence to immediately deliver Plaintiff minor.

v. To exercise reasonable skill and diligence to timely order and/or place a fetal scalp electrode and/or intrauterine pressure catheter to more accurately monitor the fetal heart rate and fetal heart rate patterns and to more accurately monitor the strength of the contractions.

w. To exercise reasonable skill and diligence to timely order a stat Cesarean section for non-reassuring fetal heart rates and/or patterns and/or fetal distress, i.e. repetitive variable decelerations and/or late decelerations and/or a decrease or absence of beat-to-beat variability of the fetal heart rate and/or bradycardia.

x. To exercise reasonable skill and diligence to timely inform the attending physician immediately of the non-reassuring fetal heart rates / patterns / fetal distress.

y. To exercise reasonable skill and diligence to timely request a crew to perform a potential stat Cesarean section, i.e. request the immediate presence of anesthesia, nurses and physicians.

z. To exercise reasonable skill and diligence to immediately discontinue the administration of Oxytocin / Pitocin when non-reassuring fetal heart tones appeared.

## STANDARD OF CARE
## DOCTOR

150.    That at all times material herein, Defendant, Dr. Gary Mennie owed duties to Plaintiffs pursuant to the patient-doctor relationship that existed between them and **pursuant to the standard of practice or care of his/her profession:**

a. To exercise reasonable skill and diligence to timely request and demand the presence of the attending physician immediately to evaluate the mother and minor fetal Plaintiff and fetal monitoring graph.

b. To exercise reasonable skill and diligence to timely diagnose non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

c. To exercise reasonable skill and diligence to timely order and/or perform intrauterine resuscitation with the administration of oxygen and IV hydration and/or changing the position of Plaintiff mother.

-29-

d. To exercise reasonable skill and diligence to timely and periodically, properly review, interpret and evaluate the fetal monitoring strip that was produced herein either in person or at the nursing station where the fetal monitoring graph was appearing on the monitor.

e. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section.

f. To exercise reasonable skill and diligence to timely and properly review, interpret the electronic fetal monitoring graph at the nursing station when the electronic fetal monitor began to sound and/or gave a color alert.  .

g. To exercise reasonable skill and diligence to timely set and/or order the setting of the audible alert and/or color alert on the electronic fetal monitor at the nursing station to alert the nurses, doctors and others of a fetal heart rate below 110 beats per minute.

h. To exercise reasonable skill and diligence to timely shut off / discontinue the administration of Pitocin / Oxytocin when fetal distress and/or non-reassuring fetal heart tones or patterns appeared on the electronic fetal heart monitor.

i. To exercise reasonable skill and diligence to timely, properly and periodically review and/or timely evaluate properly the fetal monitoring graph at the nursing station and/or bedside that was produced herein to recognize non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

j. To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit: timely order and/or perform delivery herein.

k. To timely request a crew and anesthesia to come stat so that a stat C-section could be performed stat.

l. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section so as to prevent hypoxia and/or ischemia and/or asphyxia from resulting in brain damage to minor Plaintiff.

m. To exercise reasonable skill and diligence in the presence of non-reassuring fetal heart tones, fetal distress to timely shut off / discontinue the administration of Pitocin / Oxytocin, which was causing contractions and increasing hypoxia and/or ischemia to the Plaintiff fetus.

n. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section and/or timely offer the patient mother the opportunity to have a stat C-section.

 

o. To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions.

p. To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions, to-wit: fetal distress / non-reassuring fetal heart tones or fetal heart rate patterns.

q. To exercise reasonable skill and diligence to timely treat Plaintiffs' conditions.

r. To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit:  fetal distress / non-reassuring fetal heart tones / patterns.

s. To exercise reasonable skill and diligence to timely diagnose late decelerations of the fetal heart rate and/or variable decelerations of the fetal heart rate on the fetal monitoring graph.

t. To exercise reasonable skill and diligence to timely recognize decrease and/or absence in beat-to-beat fetal heart rate variability.

u. To exercise reasonable skill and diligence to immediately deliver Plaintiff minor.

v. To exercise reasonable skill and diligence to timely order and/or place a fetal scalp electrode and/or intrauterine pressure catheter to more accurately monitor the fetal heart rate and fetal heart rate patterns and to more accurately monitor the strength of the contractions.

w. To exercise reasonable skill and diligence to  timely order a stat Cesarean section for non-reassuring fetal heart rates and/or patterns and/or fetal distress,  i.e. repetitive variable decelerations and/or late decelerations and/or a decrease or absence of beat-to-beat variability of the fetal heart rate and/or bradycardia.

x. To exercise reasonable skill and diligence to  timely inform the attending physician immediately of the non-reassuring fetal heart rates / patterns / fetal distress.

y. To exercise reasonable skill and diligence to  timely request a crew to perform a potential stat Cesarean section, i.e. request the immediate presence of anesthesia, nurses and physicians.

z. To exercise reasonable skill and diligence to immediately discontinue the administration of Oxytocin / Pitocin when non-reassuring fetal heart tones appeared.

## STANDARD OF CARE
## NURSE

151.     That at all times material herein Defendant Nurse Levy owed the following duties to Plaintiffs pursuant to the patient-nurse relationship that existed between them and pursuant to the standard of practice of her profession:

a.   To exercise reasonable skill and diligence to timely recognize non-reassuring fetal heart rates and/or fetal heart rate patterns.

b.   To exercise reasonable skill and diligence to timely recognize non-reassuring fetal heart rate or patterns and/or variable decelerations and/or decelerations of the fetal heart rate and/or late decelerations and/or a decrease or absence of beat-to-beat variability of the fetal heart rate.

c.   To exercise reasonable skill and diligence to immediately request the presence of a physician to review the fetal monitoring strip immediately when non-reassuring fetal heart rate or patterns were present on the electronic fetal monitoring graph.

d.   To exercise reasonable skill and diligence to timely perform intrauterine resuscitation, i.e. administering a bolus of IV fluids and/or the administration of oxygen and/or change the position of the mother.

e.   To exercise reasonable skill and diligence to properly, periodically and timely review the fetal monitoring graph as appeared at the nursing station.

f.   To exercise reasonable skill and diligence to timely recognize non-reassuring fetal heart tones and/or patterns.

g.   To exercise reasonable skill and diligence to immediately discontinue the administration of Oxytocin / Pitocin when non-reassuring fetal heart tones appeared.

h.   To exercise reasonable skill and diligence to refrain from administering Pitocin / Oxytocin in the presence of non-reassuring fetal heart tones.

i.   To exercise reasonable skill and diligence to timely and/or perform intrauterine resuscitation with the administration of oxygen and IV hydration and/or changing the Plaintiff mother's position when non-reassuring fetal heart rates or patterns appeared on the fetal monitoring graph.

j.   To exercise reasonable skill and diligence to timely and periodically, properly review and evaluate the fetal monitoring strip that was produced herein either in person or at the nursing station where the graph was appearing on the monitor.



k.  To exercise reasonable skill and diligence to timely and properly review, interpret the electronic fetal monitoring graph at the nursing station when the electronic fetal monitor began to sound and/or gave a color alert.

l.  To exercise reasonable skill and diligence to timely set the audible alert and/or color alert on the electronic fetal monitor at the nursing station to alert the nurses and others of a fetal heart rate below 110 beats per minute.

m.  To exercise reasonable skill and diligence to timely shut off / discontinue the administration of Pitocin / Oxytocin when non-reassuring fetal heart tones or patterns appeared on the fetal monitoring graph.

n.  To exercise reasonable skill and diligence to timely and periodically, properly review and/or timely evaluate properly the fetal monitoring graph at the nursing station and/or bedside that was produced herein to recognize non-reassuring fetal heart tones.

o.  To exercise reasonable skill and diligence to timely diagnose non-reassuring fetal heart rates and/or non-reassuring fetal heart rate patterns timely.

p.  To exercise reasonable skill and diligence to timely diagnose decrease or absence in beat-to-beat variability of the fetal heart rate.

q.  To exercise reasonable skill and diligence to timely diagnose the absence of fetal heart rate beat-to-beat variability.

r.  To exercise reasonable skill and diligence to  timely diagnose variable decelerations of the fetal heart rate.

s.  To exercise reasonable skill and diligence to timely diagnose late decelerations of the fetal heart rate.

t.  To exercise reasonable skill and diligence to  timely inform the attending physician immediately of the non-reassuring fetal heart rates / patterns.

u.  To exercise reasonable skill and diligence to timely notify a senior obstetrical resident or others of the abnormal non-reassuring fetal heart rates / patterns.

v.  To exercise reasonable skill and diligence to  timely follow the chain of command and/or request a crew to perform a potential stat Cesarean section, i.e. request the immediate presence of anesthesia, nurses and physicians.

w.  To exercise reasonable skill and diligence to timely refrain from administering Pitocin / Oxytocin in the presence of non-reassuring fetal heart tones.

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

x. To exercise reasonable skill and diligence to timely request and demand the presence of the attending physician or staff physician immediately to evaluate the mother and/or minor fetal Plaintiff and/or the electronic fetal monitoring graph.

y. To exercise reasonable skill and diligence in the presence of non-reassuring fetal heart tones to timely shut off / discontinue the administration of Pitocin / Oxytocin, which was causing contractions and increasing hypoxia and/or ischemia to the Plaintiff fetus.

## **BREACH BY NURSE**

152. That Nurse Levy breached the standard of care of her profession in at least one or more of the following particulars by failing:

a. To exercise reasonable skill and diligence to timely recognize non-reassuring fetal heart rates and/or fetal heart rate patterns.

b. To exercise reasonable skill and diligence to timely recognize non-reassuring fetal heart rate or patterns and/or variable decelerations and/or decelerations of the fetal heart rate and/or late decelerations and/or a decrease or absence of beat-to-beat variability of the fetal heart rate.

c. To exercise reasonable skill and diligence to immediately request the presence of a physician to review the fetal monitoring strip immediately when non-reassuring fetal heart rate or patterns were present on the electronic fetal monitoring graph.

d. To exercise reasonable skill and diligence to timely perform intrauterine resuscitation, i.e. administering a bolus of IV fluids and/or the administration of oxygen and/or change the position of the mother.

e. To exercise reasonable skill and diligence to properly, periodically and timely review the fetal monitoring graph as appeared at the nursing station.

f. To exercise reasonable skill and diligence to timely recognize non-reassuring fetal heart tones and/or patterns.

g. To exercise reasonable skill and diligence to immediately discontinue the administration of Oxytocin / Pitocin when non-reassuring fetal heart tones appeared.

h. To exercise reasonable skill and diligence to refrain from administering Pitocin / Oxytocin in the presence of non-reassuring fetal heart tones.

i. To exercise reasonable skill and diligence to timely and/or perform intrauterine resuscitation with the administration of oxygen and IV hydration and/or changing

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

the Plaintiff mother's position when non-reassuring fetal heart rates or patterns appeared on the fetal monitoring graph.

j.   To exercise reasonable skill and diligence to timely and periodically, properly review and evaluate the fetal monitoring strip that was produced herein either in person or at the nursing station where the graph was appearing on the monitor.

k.   To exercise reasonable skill and diligence to timely and properly review, interpret the electronic fetal monitoring graph at the nursing station when the electronic fetal monitor began to sound and/or gave a color alert.

l.   To exercise reasonable skill and diligence to timely set the audible alert and/or color alert on the electronic fetal monitor at the nursing station to alert the nurses and others of a fetal heart rate below 110 beats per minute.

m.   To exercise reasonable skill and diligence to timely shut off / discontinue the administration of Pitocin / Oxytocin when non-reassuring fetal heart tones or patterns appeared on the fetal monitoring graph.

n.   To exercise reasonable skill and diligence to timely and periodically, properly review and/or timely evaluate properly the fetal monitoring graph at the nursing station and/or bedside that was produced herein to recognize non-reassuring fetal heart tones.

o.   To exercise reasonable skill and diligence to timely diagnose non-reassuring fetal heart rates and/or non-reassuring fetal heart rate patterns timely.

p.   To exercise reasonable skill and diligence to timely diagnose decrease or absence in beat-to-beat variability of the fetal heart rate.

q.   To exercise reasonable skill and diligence to timely diagnose the absence of fetal heart rate beat-to-beat variability.

r.   To exercise reasonable skill and diligence to  timely diagnose variable decelerations of the fetal heart rate.

s.   To exercise reasonable skill and diligence to timely diagnose late decelerations of the fetal heart rate.

t.   To exercise reasonable skill and diligence to  timely inform the attending physician immediately of the non-reassuring fetal heart rates / patterns.

u.   To exercise reasonable skill and diligence to timely notify a senior obstetrical resident or others of the abnormal non-reassuring fetal heart rates / patterns.

THE THIGPEN LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

 

v. To exercise reasonable skill and diligence to timely follow the chain of command and/or request a crew to perform a potential stat Cesarean section, i.e. request the immediate presence of anesthesia, nurses and physicians.

w. To exercise reasonable skill and diligence to timely refrain from administering Pitocin / Oxytocin in the presence of non-reassuring fetal heart tones.

x. To exercise reasonable skill and diligence to timely request and demand the presence of the attending physician or staff physician immediately to evaluate the mother and/or minor fetal Plaintiff and/or the electronic fetal monitoring graph.

y. To exercise reasonable skill and diligence in the presence of non-reassuring fetal heart tones to timely shut off / discontinue the administration of Pitocin / Oxytocin, which was causing contractions and increasing hypoxia and/or ischemia to the Plaintiff fetus.

## BREACH BY DOCTOR

153. That Defendant, Dr. Hanna, **breached the aforementioned duties in at least one and possibly more of the following particulars, so far as it is presently known, by failing:**

a. To exercise reasonable skill and diligence to timely request and demand the presence of the attending physician immediately to evaluate the mother and minor fetal Plaintiff and fetal monitoring graph.

b. To exercise reasonable skill and diligence to timely diagnose non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

c. To exercise reasonable skill and diligence to timely order and/or perform intrauterine resuscitation with the administration of oxygen and IV hydration and/or changing the position of Plaintiff mother.

d. To exercise reasonable skill and diligence to timely and periodically, properly review, interpret and evaluate the fetal monitoring strip that was produced herein either in person or at the nursing station where the fetal monitoring graph was appearing on the monitor.

e. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section.

f. To exercise reasonable skill and diligence to timely and properly review, interpret the electronic fetal monitoring graph at the nursing station when the electronic fetal monitor began to sound and/or gave a color alert. .

THE HANNAHEM LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

-36-

THE THIGPEN LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

g.  To exercise reasonable skill and diligence to timely set and/or order the setting of the audible alert and/or color alert on the electronic fetal monitor at the nursing station to alert the nurses, doctors and others of a fetal heart rate below 110 beats per minute.

h.  To exercise reasonable skill and diligence to timely shut off / discontinue the administration of Pitocin / Oxytocin when fetal distress and/or non-reassuring fetal heart tones or patterns appeared on the electronic fetal heart monitor.

i.  To exercise reasonable skill and diligence to timely, properly and periodically review and/or timely evaluate properly the fetal monitoring graph at the nursing station and/or bedside that was produced herein to recognize non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

j.  To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit: timely order and/or perform delivery herein.

k.  To timely request a crew and anesthesia to come stat so that a stat C-section could be performed stat.

l.  To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section so as to prevent hypoxia and/or ischemia and/or asphyxia from resulting in brain damage to minor Plaintiff.

m.  To exercise reasonable skill and diligence in the presence of non-reassuring fetal heart tones, fetal distress to timely shut off / discontinue the administration of Pitocin / Oxytocin, which was causing contractions and increasing hypoxia and/or ischemia to the Plaintiff fetus.

n.  To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section and/or timely offer the patient mother the opportunity to have a stat C-section.

o.  To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions.

p.  To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions, to-wit: fetal distress / non-reassuring fetal heart tones or fetal heart rate patterns.

q.  To exercise reasonable skill and diligence to timely treat Plaintiffs' conditions.

r.  To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit:  fetal distress / non-reassuring fetal heart tones / patterns.

s.  To exercise reasonable skill and diligence to timely diagnose late decelerations of the fetal heart rate and/or variable decelerations of the fetal heart rate on the fetal monitoring graph.

t.  To exercise reasonable skill and diligence to timely recognize decrease and/or absence in beat-to-beat fetal heart rate variability.

u.  To exercise reasonable skill and diligence to immediately deliver Plaintiff minor.

v.  To exercise reasonable skill and diligence to timely order and/or place a fetal scalp electrode and/or intrauterine pressure catheter to more accurately monitor the fetal heart rate and fetal heart rate patterns and to more accurately monitor the strength of the contractions.

w.  To exercise reasonable skill and diligence to  timely order a stat Cesarean section for non-reassuring fetal heart rates and/or patterns and/or fetal distress,  i.e. repetitive variable decelerations and/or late decelerations and/or a decrease or absence of beat-to-beat variability of the fetal heart rate and/or bradycardia.

x.  To exercise reasonable skill and diligence to  timely inform the attending physician immediately of the non-reassuring fetal heart rates / patterns / fetal distress.

y.  To exercise reasonable skill and diligence to  timely request a crew to perform a potential stat Cesarean section, i.e. request the immediate presence of anesthesia, nurses and physicians.

z.  To exercise reasonable skill and diligence to immediately discontinue the administration of Oxytocin / Pitocin when non-reassuring fetal heart tones appeared.

## **BREACH BY DOCTOR**

154.  That Defendant, Dr. Taylor **breached the aforementioned duties in at least one and possibly more of the following particulars, so far as it is presently known, by failing:**

a.  To exercise reasonable skill and diligence to timely request and demand the presence of the attending  physician immediately to evaluate the mother and minor fetal Plaintiff and fetal monitoring graph.

b.  To exercise reasonable skill and diligence to timely diagnose non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.




c.  To exercise reasonable skill and diligence to timely order and/or perform intrauterine resuscitation with the administration of oxygen and IV hydration and/or changing the position of Plaintiff mother.

d.  To exercise reasonable skill and diligence to timely and periodically, properly review, interpret and evaluate the fetal monitoring strip that was produced herein either in person or at the nursing station where the fetal monitoring graph was appearing on the monitor.

e.  To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section.

f.  To exercise reasonable skill and diligence to timely and properly review, interpret the electronic fetal monitoring graph at the nursing station when the electronic fetal monitor began to sound and/or gave a color alert. .

g.  To exercise reasonable skill and diligence to timely set and/or order the setting of the audible alert and/or color alert on the electronic fetal monitor at the nursing station to alert the nurses, doctors and others of a fetal heart rate below 110 beats per minute.

h.  To exercise reasonable skill and diligence to timely shut off / discontinue the administration of Pitocin / Oxytocin when fetal distress and/or non-reassuring fetal heart tones or patterns appeared on the electronic fetal heart monitor.

i.  To exercise reasonable skill and diligence to timely, properly and periodically review and/or timely evaluate properly the fetal monitoring graph at the nursing station and/or bedside that was produced herein to recognize non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

j.  To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit: timely order and/or perform delivery herein.

k.  To timely request a crew and anesthesia to come stat so that a stat C-section could be performed stat.

l.  To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section so as to prevent hypoxia and/or ischemia and/or asphyxia from resulting in brain damage to minor Plaintiff.

m.  To exercise reasonable skill and diligence in the presence of non-reassuring fetal heart tones, fetal distress to timely shut off / discontinue the administration of Pitocin / Oxytocin, which was causing contractions and increasing hypoxia and/or ischemia to the Plaintiff fetus.

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

 

n. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section and/or timely offer the patient mother the opportunity to have a stat C-section.

o. To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions.

p. To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions, to-wit: fetal distress / non-reassuring fetal heart tones or fetal heart rate patterns.

q. To exercise reasonable skill and diligence to timely treat Plaintiffs' conditions.

r. To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit: fetal distress / non-reassuring fetal heart tones / patterns.

s. To exercise reasonable skill and diligence to timely diagnose late decelerations of the fetal heart rate and/or variable decelerations of the fetal heart rate on the fetal monitoring graph.

t. To exercise reasonable skill and diligence to timely recognize decrease and/or absence in beat-to-beat fetal heart rate variability.

u. To exercise reasonable skill and diligence to immediately deliver Plaintiff minor.

v. To exercise reasonable skill and diligence to timely order and/or place a fetal scalp electrode and/or intrauterine pressure catheter to more accurately monitor the fetal heart rate and fetal heart rate patterns and to more accurately monitor the strength of the contractions.

w. To exercise reasonable skill and diligence to timely order a stat Cesarean section for non-reassuring fetal heart rates and/or patterns and/or fetal distress, i.e. repetitive variable decelerations and/or late decelerations and/or a decrease or absence of beat-to-beat variability of the fetal heart rate and/or bradycardia.

x. To exercise reasonable skill and diligence to timely inform the attending physician immediately of the non-reassuring fetal heart rates / patterns / fetal distress.

y. To exercise reasonable skill and diligence to timely request a crew to perform a potential stat Cesarean section, i.e. request the immediate presence of anesthesia, nurses and physicians.

 

z.  To exercise reasonable skill and diligence to immediately discontinue the administration of Oxytocin / Pitocin when non-reassuring fetal heart tones appeared.

## **BREACH BY DOCTOR**

155.    That Defendant, Dr. Pezeshki, **breached the aforementioned duties in at least one and possibly more of the following particulars, so far as it is presently known, by failing:**

a.  To exercise reasonable skill and diligence to timely respond and be present immediately to evaluate the mother and minor fetal Plaintiff and fetal monitoring graph when told of abnormal fetal heart rates and/or patterns.

b.  To exercise reasonable skill and diligence to timely diagnose non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

c.  To exercise reasonable skill and diligence to timely order and/or perform intrauterine resuscitation with the administration of oxygen and IV hydration and/or changing the position of Plaintiff mother.

d.  To exercise reasonable skill and diligence to timely and periodically, properly review, interpret and evaluate the fetal monitoring strip that was produced herein either in person or at the nursing station where the fetal monitoring graph was appearing on the monitor.

e.  To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section.

f.  To exercise reasonable skill and diligence to timely and properly review, interpret the electronic fetal monitoring graph at the nursing station when the electronic fetal monitor began to sound and/or gave a color alert. .

g.  To exercise reasonable skill and diligence to timely set and/or order the setting of the audible alert and/or color alert on the electronic fetal monitor at the nursing station to alert the nurses, doctors and others of a fetal heart rate below 110 beats per minute.

h.  To exercise reasonable skill and diligence to timely shut off / discontinue the administration of Pitocin / Oxytocin when fetal distress and/or non-reassuring fetal heart tones or patterns appeared on the electronic fetal heart monitor.

i.  To exercise reasonable skill and diligence to timely, properly and periodically review and/or timely evaluate properly the fetal monitoring graph at the nursing

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222



THE THOMPSON LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

station and/or bedside that was produced herein to recognize non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

j.  To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit: timely order and/or perform delivery herein.

k.  To timely request a crew and anesthesia to come stat so that a stat C-section could be performed stat.

l.  To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section so as to prevent hypoxia and/or ischemia and/or asphyxia from resulting in brain damage to minor Plaintiff.

m.  To exercise reasonable skill and diligence in the presence of non-reassuring fetal heart tones, fetal distress to timely shut off / discontinue the administration of Pitocin / Oxytocin, which was causing contractions and increasing hypoxia and/or ischemia to the Plaintiff fetus.

n.  To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section and/or timely offer the patient mother the opportunity to have a stat C-section.

o.  To exercise reasonable skill and diligence to tell those telling her of abnormal fetal heart rates or patterns to have another staff physician to come immediately and evaluate and treat Plaintiffs, if she was unable to come immediately to evaluate and treat Plaintiffs.

p.  To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions.

q.  To exercise reasonable skill and diligence to timely advise the OB/GYN resident to immediately perform a C-section in her absence because of non-reassuring fetal heart rates and patterns.

r.  To exercise reasonable skill and diligence to timely treat Plaintiffs' conditions.

s.  To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit:  fetal distress / non-reassuring fetal heart tones / patterns.

t.  To exercise reasonable skill and diligence to timely diagnose late decelerations of the fetal heart rate and/or variable decelerations of the fetal heart rate on the fetal monitoring graph.

u.  To exercise reasonable skill and diligence to timely recognize decrease and/or absence in beat-to-beat fetal heart rate variability.

 

v.  To exercise reasonable skill and diligence to immediately deliver Plaintiff minor.

w.  To exercise reasonable skill and diligence to timely order and/or place a fetal scalp electrode and/or intrauterine pressure catheter to more accurately monitor the fetal heart rate and fetal heart rate patterns and to more accurately monitor the strength of the contractions.

x.  To exercise reasonable skill and diligence to timely order a stat Cesarean section for non-reassuring fetal heart rates and/or patterns and/or fetal distress, i.e. repetitive variable decelerations and/or late decelerations and/or a decrease or absence of beat-to-beat variability of the fetal heart rate and/or bradycardia.

y.  To exercise reasonable skill and diligence to timely inform the attending physician immediately of the non-reassuring fetal heart rates / patterns / fetal distress.

z.  To exercise reasonable skill and diligence to timely request a crew to perform a potential stat Cesarean section, i.e. request the immediate presence of anesthesia, nurses and physicians.

aa. To exercise reasonable skill and diligence to immediately discontinue the administration of Oxytocin / Pitocin when non-reassuring fetal heart tones appeared.

## **BREACH BY DOCTOR**

156.    That Defendant, Dr. Mennie, **breached the aforementioned duties in at least one and possibly more of the following particulars, so far as it is presently known, by failing:**

a.  To exercise reasonable skill and diligence to timely request and demand the presence of the attending physician immediately to evaluate the mother and minor fetal Plaintiff and fetal monitoring graph.

b.  To exercise reasonable skill and diligence to timely diagnose non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

c.  To exercise reasonable skill and diligence to timely order and/or perform intrauterine resuscitation with the administration of oxygen and IV hydration and/or changing the position of Plaintiff mother.

d.  To exercise reasonable skill and diligence to timely and periodically, properly review, interpret and evaluate the fetal monitoring strip that was produced herein either in person or at the nursing station where the fetal monitoring graph was appearing on the monitor.

e. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section.

f. To exercise reasonable skill and diligence to timely and properly review, interpret the electronic fetal monitoring graph at the nursing station when the electronic fetal monitor began to sound and/or gave a color alert. .

g. To exercise reasonable skill and diligence to timely set and/or order the setting of the audible alert and/or color alert on the electronic fetal monitor at the nursing station to alert the nurses, doctors and others of a fetal heart rate below 110 beats per minute.

h. To exercise reasonable skill and diligence to timely shut off / discontinue the administration of Pitocin / Oxytocin when fetal distress and/or non-reassuring fetal heart tones or patterns appeared on the electronic fetal heart monitor.

i. To exercise reasonable skill and diligence to timely, properly and periodically review and/or timely evaluate properly the fetal monitoring graph at the nursing station and/or bedside that was produced herein to recognize non-reassuring fetal heart tones and/or fetal heart rate patterns and/or fetal distress.

j. To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit: timely order and/or perform delivery herein.

k. To timely request a crew and anesthesia to come stat so that a stat C-section could be performed stat.

l. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section so as to prevent hypoxia and/or ischemia and/or asphyxia from resulting in brain damage to minor Plaintiff.

m. To exercise reasonable skill and diligence in the presence of non-reassuring fetal heart tones, fetal distress to timely shut off / discontinue the administration of Pitocin / Oxytocin, which was causing contractions and increasing hypoxia and/or ischemia to the Plaintiff fetus.

n. To exercise reasonable skill and diligence to timely order and/or timely perform a stat Cesarean section and/or timely offer the patient mother the opportunity to have a stat C-section.

o. To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions.

p.  To exercise reasonable skill and diligence to timely diagnose Plaintiffs' conditions, to-wit: fetal distress / non-reassuring fetal heart tones or fetal heart rate patterns.

q.  To exercise reasonable skill and diligence to timely treat Plaintiffs' conditions.

r.  To exercise reasonable skill and diligence in the timely treatment and care of Plaintiffs' conditions, to-wit:  fetal distress / non-reassuring fetal heart tones / patterns.

s.  To exercise reasonable skill and diligence to timely diagnose late decelerations of the fetal heart rate and/or variable decelerations of the fetal heart rate on the fetal monitoring graph.

t.  To exercise reasonable skill and diligence to timely recognize decrease and/or absence in beat-to-beat fetal heart rate variability.

u.  To exercise reasonable skill and diligence to immediately deliver Plaintiff minor.

v.  To exercise reasonable skill and diligence to timely order and/or place a fetal scalp electrode and/or intrauterine pressure catheter to more accurately monitor the fetal heart rate and fetal heart rate patterns and to more accurately monitor the strength of the contractions.

w.  To exercise reasonable skill and diligence to  timely order a stat Cesarean section for non-reassuring fetal heart rates and/or patterns and/or fetal distress,  i.e. repetitive variable decelerations and/or late decelerations and/or a decrease or absence of beat-to-beat variability of the fetal heart rate and/or bradycardia.

x.  To exercise reasonable skill and diligence to  timely inform the attending physician immediately of the non-reassuring fetal heart rates / patterns / fetal distress.

y.  To exercise reasonable skill and diligence to  timely request a crew to perform a potential stat Cesarean section, i.e. request the immediate presence of anesthesia, nurses and physicians.

z.  To exercise reasonable skill and diligence to immediately discontinue the administration of Oxytocin / Pitocin when non-reassuring fetal heart tones appeared.

157.   Corporate Defendants herein failed to timely exercise due care and skill in the selection, training and supervision of their staff, interns, residents, agents, servants and/or employees and/or permitted Defendants' doctors to remain on their staff or permitted them to be on their staff when same were unfit and/or inexperienced to render such medical care.

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221
(248) 354-2222

-45-




158.     That Defendants and each of them, their agents, servants and/or employees, at all times mentioned herein were required to exercise reasonable skill and diligence to follow and comply with:

> PART 1. ADMINISTRATIVE RULES AND PROCEDURES
> R 325.1058 Mothers' records.
> **Rule 58. (1) Mothers' records shall contain:**
> **(2) Except in emergencies, the patient's admission examination shall record the following information:**
> (e) The rate and character of the fetal heart.
> **(3) A delivery room record book shall be maintained with chronological entries of all deliveries including items pertinent to the history of each delivery.**
> **R 325.1028 Records.**
> **Rule 29. (1) The hospital shall require that accurate and complete medical records be kept on all patients admitted.**
> **(2) Patients' records shall include the following:**
> (b) Admitting diagnosis.
> (c) History and physical examination.
> (d) Physician's progress notes.
> (e) Operation and treatment notes and consultations.
> (f) The physician's orders.
> (g) Nurse's notes including temperature, pulse, respiration, conditions observed and medication given.
> **Rule 52. The following minimum policies shall he established and observed:**
> **(b) The hospital shall require that there be staff policies concerning the use of pituitrin extracts and other oxytocics during each of the 3 stages of labor, and the policies shall be posted in all delivery units.**

159.     **That MCLA 333.20175 provides:**

> (1)  **A health facility or agency shall keep and maintain a record for each patient including a full and complete record of tests and examinations performed, observations made, treatments provided,** and in the case of a hospital, the purpose of the hospitalization.

> (2)  **A hospital shall take precautions to assure that the records required by subsection (1) are not wrongfully altered or destroyed. (emphasis added)**.

160.     Corporate Defendants, Providence Hospital and Medical Centers, Inc. and/or St. John Health, are liable herein by virtue of their independent negligence and/or under the

Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

doctrine of RESPONDEAT SUPERIOR for the acts of their agents, servants, and/or employees, and other persons who rendered care, treatment or medical services to Plaintiffs under some concession arrangement because of their apparent authority to be the agents, servants and/or employees of Defendant Hospital.

161.    Corporate Defendants, Providence Hospital and Medical Centers, Inc. and/or St. John Health, are liable herein for negligence / malpractice under the doctrine of RESPONDEAT SUPERIOR for the acts of their agents, servants, and/or employees, and other persons who rendered care, treatment or medical services to Plaintiffs under some concession arrangement because of their apparent authority to be the agents, servants and/or employees of Defendant employer.

162.    Plaintiffs were not under any obligation to inquire whether each person who attended them, rendered medical care or treatment or medical services at said Hospital, was an employee or an independent contractor at Defendant Hospital.

163.    That Defendants and each of them, their agents, servants and/or employees, changed and/or altered the records herein in violation of the standard of care and/or Michigan statutes.

164.    That Defendants, Providence Hospital and Medical Centers, Inc. and/or St. John Health, were guilty of independent negligence to Plaintiffs by carelessly and/or negligently permitting nurses, and other personnel as well as physicians, to be employed by Defendants or to be given privileges or continued privileges at Defendant Hospital and/or to be on the staff of Defendant Hospital, when Defendant Hospital knew or in the exercise of reasonable care should have known, that said persons were unfit to render medical care and attention to Plaintiffs by reason of their inexperience and/or habitual negligent conduct.

165.    That Defendant corporate employers were guilty of independent negligence to Plaintiffs by negligently and/or carelessly permitting nurses, and other personnel as well as physicians, to be employed by Defendant employers and/or be on the staff of Defendant employers who Defendant employers knew or in the exercise of reasonable care should have known, that said persons were unfit to render medical care and attention to Plaintiffs by reason of their inexperience and/or habitual negligent conduct.

166.    Corporate Defendants are liable to Plaintiffs herein under the doctrine of respondeat superior, either real or ostensible.

167.    That at all times material herein, the injuries and/or damages suffered by the Plaintiffs were more probably than not proximately caused by the negligence/malpractice of the Defendants, their agents, servants and/or employees, either real or ostensible.

168.    That Plaintiff, Marc Burke, Jr., sustained personal injuries as a direct and proximate result of Defendants' negligence and malpractice as herein alleged.



169.    That as a direct and proximate result of the negligence and malpractice as herein alleged of Defendants, and each of them, their agents, servants and/or employees, either real or ostensible, as aforesaid, the injured Plaintiff, Marc Burke, Jr.:

    a.  sustained severe and permanent bodily injuries which were painful, disabling and necessitated medical care; and/or

    b.  suffered shock, mental anguish, fright and emotional damage; and/or

    c.  sustained possible aggravation of pre-existing conditions and/or reactivation of dormant conditions; and/or

    d.  was and/or may continue to be unable to attend to his usual affairs, daily activities, including, but not limited to, household chores, and personal needs; and/or

    e.  was and/or may continue to be unable to render services including, but not limited to, household chores, and personal needs; and/or

    f.  hampered said Plaintiff in the enjoyment of the normal pursuit of life; and/or

    g.  said injuries are permanent to the degree that Plaintiff suffered a loss in ability to earn money and will have impaired earning capacity in the future; and/or

    h.  will continue to have pain and suffering in the future as well as permanent impairment and disabilities.

    i.  said injuries are permanent and Plaintiff will continue to have said damages in the future; and/or

    j.  any other damages which are applicable and which are recoverable pursuant to statute, case law and Michigan court rules.

170.    That at all times material herein, Plaintiff, Marc Burke, Jr., was not at fault and/or was not negligent.

171.    That at all times material herein, as a direct and proximate result of the negligence of one or more of the Defendants, their agents, servants and/or employees, either real or ostensible:

    a.  Minor Plaintiff is quadriplegic resulting in a total permanent functional loss of one or more limbs caused by injury to the brain and/or injury to the spinal cord.

    b.  Minor Plaintiff has permanently impaired cognitive capacity rendering him incapable of making independent, responsible life decisions and permanently incapable of independently performing the activities of normal daily living.

THE THOMPSON LAW FIRM, P.L.L.C.
Attorneys at Law
1000 TOWN CENTER
SUITE 500
Southfield, Michigan 48075-1221

(248) 354-2222

172.    That as a direct and proximate result of the negligence / malpractice as herein alleged of Defendants, and each of them, their agents, servants and/or employees, either real or ostensible, the injured Plaintiffs have suffered and/or will continue to suffer damages, both past and future, permitted under the law, including, but not limited to, one or more of the following: attendant care, medical expenses, medical supplies, medicine and equipment, hospital expenses, nursing home expenses, loss of wages, loss of ability to work, loss of ability to care for self needs, loss of ability to care for family members, impaired earning capacity, past miscellaneous expenses, loss of ability to care for household needs, future miscellaneous expenses, loss of insurance benefits, loss of benefits, vocational rehabilitation expenses, special education expenses, home modification expenses, transportation expenses, supervision and any and all other damages which are applicable and are recoverable pursuant to the statutes of the State of Michigan, case law and court rules.

173.    That as a direct and proximate result of the negligence / malpractice of the Defendants, and each of them, their servants, agents and/or employees, either real or ostensible, and the resulting injuries to Plaintiffs, Plaintiffs did and may continue to incur expenses for hospitals, doctors, diagnostic tests, medical procedures, therapies, x-rays, medicines and other medical supplies, equipment, attention, rehabilitation, nursing, and attendant care.

174.    That Tyee Burke is the mother of Marc Burke, Jr.

175.    That Plaintiff's parent witnessed the infliction of tortuous injuries upon her child by Defendants and suffered from adverse consequential effects due to the negligence and malpractice of the Defendants, their agents, servants and/or employees, either real or ostensible, including severe emotional, nervous, and mental disturbances resulting in headaches, depression, and permanent emotional and nervous disturbances.

176.    That as a direct and proximate result of the negligence and malpractice of Defendants, and each of them, their agents, servants and/or employees, either real or ostensible, and the resulting injuries to Plaintiff, Plaintiff's parents did and/or may continue to incur <u>expenses</u> for and/or perform services, including, but not limited to, nursing services, attendant care, household chores, personal services, and personal care.

177.    That Plaintiff, Tyee Burke, has been appointed by the Wayne County Circuit Court as <u>Next Friend</u> for Plaintiff, Marc Burke, Jr., a minor, born on 11/23/02.

178.    That the amount in controversy herein exceeds Twenty-Five Thousand ($25,000) Dollars.

WHEREFORE, Plaintiffs pray that the Court grant judgment against Defendants, jointly and severally, in whatever amount Plaintiffs are found to be entitled for compensatory damages; and for the penalties and Plaintiffs actual attorney fees, plus interest and costs.

**THE THURSWELL LAW FIRM, P.L.L.C.**

By: ARDIANA CULAJ (P71553)
For the Firm
Attorney for Plaintiffs
1000 Town Center, Suite 500
Southfield, MI 48075
(248) 354-2222

DATED:  5-2-11

## DEMAND FOR JURY

NOW COME the above-named Plaintiffs, by and through their attorneys, THE THURSWELL LAW FIRM, P.L.L.C., and hereby make formal demand for a trial by jury of the facts and issues involved in this cause of action.

**THE THURSWELL LAW FIRM, P.L.L.C.**

By: ARDIANA CULAJ (P71557)
For the Firm
Attorney for Plaintiffs
1000 Town Center, Suite 500
Southfield, MI 48075
(248) 354-2222

DATED:  5-2-11

State of MICHIGAN )
                  )SS:
County of OAKLAND)

## AFFIDAVIT OF MERIT OF HEALTH CARE PROFESSIONAL

Dr. Michael Berke, being first duly sworn, deposes and states the following:

1. I am a licensed health care professional board certified in obstetrics and gynecology.

2. I certify that I have reviewed the Notice of Intent to File Claim and the statements set forth in the Notice of Intent to File Claim are within my area of specialty, and were on the date of the malpractice, and one year prior to the date of the alleged malpractice. In addition, I have reviewed all of the medical records provided by the Plaintiffs' attorney concerning the allegations contained in the notice. I further state that the opinions in this Affidavit are preliminary as I have not had an opportunity to review deposition testimony and may, in the future, be provided with additional medical records and other evidence. In the event additional information is made available, I reserve the right to amend the opinions stated in this Affidavit.

3. Tyee Burke was a 29-year-old gravida 4, para 1, AB 2, with an estimated date of confinement (due date) of 11/26/02. She received prenatal care per the ACOG antepartum record on 9/10/02 at 19-1/2 weeks' gestation, 10/1/02, 10/15/02, 11/5/02, 11/14/02 and 11/19/02. The note of 9/12/02 at 8:30 a.m. indicates, "Spoke with patient re abnormal quad screen. Will refer to maternal-fetal medicine as soon as possible for evaluation."

The note of 11/1/02 indicates, "Ultrasound 9/26/02 → 31-2/7 weeks, large for dates. She is having another ultrasound next Thursday because fetal anatomy was not clear. We contacted maternal-fetal medicine trying to refer patient to them. We faxed ultrasound quad. After reviewing ultrasound they said we can follow up with the patient, isn't high risk, it's mostly wrong dates."

On 10/1/02 the note reads, "With LMP of 4/29/02 and an estimated gestational age of 22 weeks by dates, an ultrasound done 9/26/02 showed estimated gestational age 31-2/7 weeks resulting in an EDD (estimated date of confinement) of 11/6/02. Quad screen 11/4/02 was actually done at 28 weeks, not 18 weeks, and was abnormal. All results faxed to maternal-fetal medicine and reviewed by Dr. Wright. Per nurse Becky, okay to use ultrasound date of delivery, quad screen is inaccurate. Continue routine prenatal care, patient doing well."

The admitting history & physical by the resident was documented at approximately 2:00 a.m. The assessment at that time was a 29-year-old female, G4, P1 with intrauterine pregnancy at 39-4/7 weeks with deep variable decelerations. The plan on admission was oxygen per mask, IV fluids, lateral position and Pitocin per protocol. It was also documented that this plan was discussed with Dr. Taylor.

It should be noted that the patient tested positive for opiates and barbiturates. However, the records indicate that Morphine (opiates) for pain was administered on 11/23/02 at 5:05 a.m.; Fentanyl (opiate for anesthesia)

2

was administered on 11/23/02 at 3:00 a.m. and 4:26 a.m.; STP (sodium

thiopental – a barbiturate for anesthesia) was administered on 11/23/02 at

3:00 a.m.  The blood drawn for the urine drug screen was at 7:00 a.m. on

11/23/02. (See the anesthesia record, the nursing observation and intervention

records. At 4:26 a.m. Fentanyl 100 MCG for anesthesia; 5:05 a.m. Morphine

PCA programmed.

Tyee Burke was a 29-year-old who came to Providence Hospital on

11/23/02. She was seen in triage complaining of contractions every 5-6

minutes. She was 39-4/7 weeks' gestation. She was complaining of irregular

umbilical cord during the past few hours and she had positive fetal movement.

An electronic fetal monitor was attached to her in triage at approximately

0055 on 11/23/02. A vaginal exam was performed upon her at 0100, which

showed she was 1-2 cm dilated, 50% effaced at a -3 station.

On 11/23/02 at 1:10 a.m., Nurse Abernathy noted that the fetal heart

rate baseline was in the 140's with positive variability and decelerations to

120-110.  She notes at 1:10 a.m. that an IV had been started and that the fetal

heart tones were at 150 down to 120 and 110, and the resident Dr. Hanna was

made aware of the decelerations of the fetal heart rate.

The fetal monitoring graph with computer notes thereon for 11/23/02

note that Dr. Hanna was at the bedside at 1:13 a.m. per Nurse Abernathy. On

11/23/02 at approximately 1:30 a.m., the nurse documented the EFM had a

decel down to 90.  On 11/23/02 at approximately 1:40 a.m. with the baseline

being approximately 150, there was a fetal heart rate deceleration down to the 60's and again the resident Dr. Hanna was made aware of the decelerations.

On 11/23/02 at approximately 1:40 a.m. the note of Nurse Levy indicates that Tyee Burke was transferred to LDR (labor delivery recovery). She was admitted as an inpatient.

On 11/23/02 at 0200 there were decelerations down to 70 from 120 bpm. The plan was to induce labor and start Pitocin per the protocol. This plan was discussed with Dr. Taylor.

On 11/23/02 at approximately 0204 the fetal heart rate was 140-150 bpm with positive variability and there were decelerations of the fetal heart rate down to 120. At 0210 the nurse identified a decel on the EFM to 110 to 120. Pitocin was started and was to be given per "protocol."

On 11/23/02 at 0254 the fetal heart tones at the nursing station showed the baby's heart rate to be down to the 60's, and that Dr. Hanna was called to the patient's room. The Pitocin was discontinued, an IV bolus was given and the oxygen was already on.

That on 11/23/02 at 0255 there were decelerations of the baby's heart rate down to the 60's.

The note at 0300 states the resident had been called at 0256 due to deep decelerations of the baby's heart rate. They repositioned the mother and the deep decelerations persisted and they attempted to place the internal scalp lead.

4

That on 11/23/02 at 0300 an internal scalp lead was placed, there were rupture of membranes with thick meconium. Apparently, the internal scalp lead was not functioning and a second internal scalp lead was placed and the notes indicate that the fetal heart tones audibly (heard) were down to the 90's and they couldn't trace on the monitor.

That on 11/23/02 at 0303 a second scalp lead had been placed and a Foley catheter was placed and she was shaved apparently in preparation for a possible Cesarean section. Dr. Pezeshki was called. At 3:03 a.m. the fetal heart tones were noted to be down in the 40-50's and Dr. Pezeshki ordered a stat Cesarean section. At 3:06 a.m. Tyee was taken to the Operating Room for a stat Cesarean section.

Marc Burke was born on 11/23/02 at 3:17 a.m. by Cesarean section. The baby was born within 14-15 minute from the time the stat C-section had been called by Dr. Pezeshki.

The records indicate that the Cesarean section had been performed for non-reassuring fetal status, other places in the records it states the reasons for the C-section were abnormal fetal heart rate pattern, non-reassuring fetal heart tones. Other places it indicates that the Cesarean section was performed because of fetal bradycardia into the 90's, fetal heart tones noted to be in the range of 72-108 in the Operating Room.

At birth, Marc Burke weighed 2602 grams. At birth he had no heart rate, no movement, and no spontaneous respirations. The cord blood gas pH was 6.99 and base deficit was -18. Apgar scores were 0 / 0 / 0. He required

extensive resuscitation at birth, including intubation, chest compressions and medications. The newborn physical exam "revealed a comatose term infant" on a vent. He received sodium bicarbonate, Epinephrine. In the NICU he appeared flaccid and pale. His Apgar scores were 0 at one minute of life, 0 at five minutes of life and 2 at ten minutes of life. Dr. Dajani, neonatologist noted in the chart that the baby was in serious condition and that he may not survive, may die, and the mother was also informed that he was at high risk for cerebral palsy, brain damage if he survived. Marc was transferred to Children's Hospital of Michigan on mechanical ventilation. At the time of transfer his condition was described as "critical." The records further indicate that he had suffered from "perinatal asphyxia" and the C-section had been performed because of "fetal distress."

The records from Children's Hospital of Michigan for 11/23/02 then indicate also that Marc Burke had suffered from "asphyxia." The first head ultrasound performed at Children's Hospital of Michigan on 11/23/02 was suggestive of cerebral edema. An MRI of his brain at Children's Hospital of Michigan on 12/9/02 indicates that he had suffered from perinatal severe asphyxia and that the abnormal findings on the MRI were likely secondary to asphyxia. The records of Children's Hospital of Michigan indicate that he had suffered from hypoxic-ischemic encephalopathy. Other places at Children's Hospital of Michigan state that Marc had suffered from encephalopathy due to hypoxia at birth.

# Standard of Practice / Violations of the Standard of Practice

The **standard of practice** required that the residents and attending physician caring for Tyee Burke interpret the fetal monitoring graphs and recognize non-reassuring fetal heart tones, abnormal fetal heart rates, and abnormal fetal heart rate patterns occurred (i.e. late decelerations, variable decelerations, and prolonged decelerations).  When non-reassuring fetal heart rates and/or patterns appeared on the fetal monitoring graph and Tyee was remote from delivery, the standard of practice required they order a stat C-section.

In **violation of the standard of care**, they failed to properly interpret the fetal monitoring graph, failed to recognize non-reassuring fetal heart rates and patterns and order a stat C-section by approximately 2:10 a.m. on 11/23/02.

The **standard of practice** required that the attending and residents not order Oxytocin / Pitocin for Tyee Burke who had non-reassuring fetal heart tones, non-reassuring fetal heart rate patterns, who was remote from delivery, as causing or augmenting contractions would only increase and make worse the hypoxia and ischemia to baby Marc Burke, Jr., which was evident on the fetal monitoring tracing.

In **violation of the standard of practice**, Pitocin was ordered and administered to Tyee Burke in the presence of non-reassuring fetal heart rates / patterns.

The **standard of practice** required that the physicians order a stat Cesarean section at approximately 2:10 a.m. on 11/23/02.

7

## Causation

In **violation of the  standard of care** the physicians failed to order a stat

C-section at approximately 2:10 a.m. on 11/23/02.  Had the stat Cesarean section

been ordered at 2:10 a.m., as required by the standard of practice, Marc Burke

would have been born 15 minutes later at 2:25 a.m.  It is clear that a stat Cesarean

section could and was in fact perform at Providence Hospital  within 15 minutes

from the time it was ordered stat.   In addition, the administration of Pitocin

worsened the hypoxia and ischemia sustained by Marc Burke.

If Marc Burke had been delivered at the latest by 2:40 a.m., he would not

have suffered oxygen deprivation to his brain, he would not have suffered from

brain damage, hypoxic-ischemic encephalopathy, asphyxia between 0240 and

0317 (time of birth), but would be normal today. As a result of the failure to

follow the standard of practice, and deliver Marc Burke in a timely fashion at the

latest by 2:40 a.m., as aforesaid, Marc Burke suffers from brain damage, as

described in the Children's Hospital of Michigan records, being cerebral palsy,

developmental delay, spastic quadriplegia and mental retardation, as well as

seizures.  That the non-reassuring fetal status, the failure to receive oxygen-rich

blood was cumulative and progressive and resulted in the child's brain injury.

During the delay in delivering minor Plaintiff Marc Burke, he suffered from

progressive, prolonged and cumulative hypoxia (decrease in oxygen-rich blood)

and/or ischemia to his brain.  Brain cells need oxygen to live, and as a result of

the failure to receive the oxygen, brain cells of minor Plaintiff died.

4.  My opinions in this Affidavit of Merit are preliminary and are based upon the
     specific information contained in the medical records in this particular case

provided to me prior to signing this Affidavit of Merit. As additional

information is obtained through additional medical records and throughout the

course of discovery, including depositions, I reserve the right to modify and/or

alter and/or change my opinions. The opinions expressed herein are based

solely on the medical records supplied to me, as well as my knowledge,

training, skill and experience. The above is meant to serve as a summary of

my opinions, and may not include each and every opinion I have formulated.

5. That this is a meritorious case.

Further, affiant saith not.

_____
Dr. Michael Berke

Subscribed and sworn to before me this
_____ day of _____, 2011.

_____
Notary Public
County: _____
My Commission Expires: _____

ANDREW B. DAILY
Notary Public, State of Michigan
County of Wayne
My Commission Expires Feb, 08, 2012
Acting in the County of _____